**Thelma MITCHELL, et al., Plaintiffs,**

v.

**INDUSTRIAL CREDIT CORPORATION, d/b/a Columbus Finance Company; and Voyager Life Insurance Company; et al., Defendants.**

**No. CV93–H–2619–E.**

United States District Court,
N.D. Alabama,
Eastern Division.

June 22, 1995.

Harvey B. Campbell, Jr., Campbell & Campbell, Talladega, AL, Betty Love, Love Love & Love, Talladega, AL, Huel M. Love, Jr., Talladega, AL, for Thelma Mitchell, Timmy Mitchell, Denise Davis, Douglas Martin.

Frank M. Bainbridge, Jr., Bruce F. Rogers, Bainbridge Mims Rogers & Smith, Birmingham, AL, for Industrial Credit Corporation.

William B. Hairston, Jr., Judith D. Holt, Engel Hairston & Johanson, Birmingham, AL, for Voyager Insurance Company, Voyager Life Insurance Company, Voyager Guaranty Insurance Company.

L. Tennent Lee, III, Burr & Forman, Huntsville, AL, for First American Bank of Georgia, First Union National Bank of Georgia.

Myron B. Waits, Talladega, AL, for Margaret Lois Herman, Margaret Lois Williamson, Lou Ann Simmons, Doris Fowler Wells.

Michael B. Maddox, Jeffrey W. Parmer, Woodall & Maddox, Birmingham, AL, for Utica Mutual Insurance Company.

## MEMORANDUM OF DECISION

HANCOCK, District Judge.

The court has before it the September 14, 1994 motion for summary judgment filed by plaintiffs Thelma Mitchell, Timmy Mitchell, Denise Davis, and Douglas Martin. Pursuant to the court's September 16, 1994 order, that motion was deemed submitted for decision, without oral argument, as of October 14, 1994. The court also has before it the September 16, 1994 motions for summary judgment filed by defendants Voyager Life Insurance Co. ("Voyager Life"); Voyager Guaranty Insurance Co. ("Voyager Guaranty"); Industrial Credit Corp. ("ICC"); and Margaret Lois Williamson, Lou Ann Simmons, and Doris Fowler. ("Individual defendants").[1] Pursuant to the court's September 19, 1994 order, those motions were deemed submitted for decision, without oral argument, as of October 18, 1994.

---

1. Defendant ICC filed six separate motions for summary judgment addressing counts I, II, IV, V, VII, and VIII respectively. The individual defendants filed a joint motion for summary judgment.

The four named plaintiffs for themselves and on behalf of a class of similarly situated individuals filed their complaint on November 17, 1993 in the Circuit Court of Talladega County, Alabama alleging the following counts against the defendants ICC, Voyager Insurance Company, First American Bank of Georgia, Margaret Lois Herman, Lou Ann Simmons, Doris Fowler Wells, and various fictitious defendants: Count I—violation of *Ala.Code* § 5–19–1 *et seq.* ("Mini Code"); Count II—violation of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.;* Count III—violation of RICO, 18 U.S.C. § 1961 *et seq.;* Count IV—fraudulent misrepresentation; Count V—breach of fiduciary duty; Count VI—misrepresentation; and Count VII—fraudulent concealment. This action was removed to this court on December 15, 1993, and defendants Voyager Insurance Co. and First American Bank of Georgia filed their respective answers on December 15, 1994. ICC and the individual defendants filed their answers on December 20, 1994. By the court's March 11, 1994 order, Count VI of the plaintiffs' complaint was dismissed. By this same order, the court allowed plaintiffs leave to amend the complaint, and such amendment was filed on March 18, 1994. The amendment substituted First Union National Bank of Georgia for First American Bank of Georgia; Margaret Lois Williamson for Margaret Lois Herman; and Voyager Life Insurance Co. for Voyager Insurance Company. Voyager Guaranty Insurance Company was also added as a party defendant. The March 18, 1994 amendment also added a claim against ICC for violation of the Small Loan Act, *Ala.Code* § 5–18–1 *et seq.* (count VIII) and a claim against Voyager Life for violations of the regulatory provisions of Title 27 of the Alabama Code (count IX). First Union National Bank of Georgia filed its answer on March 24, 1994. Defendants Voyager Life and Voyager Guaranty filed their answer on April 7, 1994, and ICC filed an amended answer on April 26, 1994. By its March 31, 1994 order, the court set forth the appropriate defendants under each count.[2] This same order also stated that the first phase of this case would focus on the claims of the named plaintiffs and that discovery regarding putative class members and class status would be allowed, if appropriate, at a later time. Defendant First Union National Bank of Georgia was subsequently dismissed from this action by the court's May 13, 1994 order. By the court's August 9, 1994 order, Count III of plaintiffs' complaint was dismissed, and defendants Voyager Life and the three individual defendants were dismissed from Count I.

Plaintiffs, ICC, Voyager Life, Voyager Guaranty, and the individual defendants have all submitted briefs in support of and in opposition to the various motions for summary judgment.[3] The court has before it the following evidence in relation to the motions for summary judgment: 1) the requests for admission and responses of each party; 2) affidavits, depositions and exhibits filed by plaintiffs in conjunction with their motion for summary judgment on September 14, 1994; 3) exhibits, documents, and excerpts from depositions submitted in conjunction with all motions for summary judgment filed on September 16, 1994; 4) depositions submitted September 23, 1994; 5) exhibits filed September 26, 1994; 6) documents and excerpts of depositions submitted by defendant Voyager Guaranty on September 27, 1994; and 7) documents and excerpts of depositions submitted by defendant Voyager Life on September 27, 1994. The above contains all of the evidence before the court upon consideration of the motions for summary judgment.[4]

2. The court noted that the appropriate defendants in each count are as follows: Count I—ICC, Voyager Life, First Union National Bank of Georgia, and the individual defendants; Count II—ICC; Count III—ICC, Voyager Life, and the three individual defendants; Count IV—ICC, Voyager Guaranty, and the three individual defendants; Count V—ICC and the three individual defendants; Count VII—ICC and the three individual defendants; Count VIII—ICC; and Count IX—Voyager Life.

3. The court does not have before it a brief in support of Voyager Life's motion for summary judgment.

4. Plaintiffs filed a motion for consideration of additional evidence on October 18, 1994 with exhibits attached. The court has not considered this evidence with regard to the various motions for summary judgment.

■ The evidence submitted reveals the following facts:[5] Defendant ICC is a Georgia corporation doing business in Alabama as Columbus Finance Company. *See* ICC's Response 2 to Plaintiff's Request for Admission. ICC is engaged in the business of consumer finance or more specifically providing small loans up to $2,000 to consumers. *See* Deposition of Nina Anderson p. 9–10. Defendant Voyager Guaranty is a Missouri corporation with its principal place of business in Texas and is in the business of selling non-filing insurance to creditors.[6] *See* Deposition of Thomas McCraw p. 13. Defendant Voyager Life is a Georgia corporation involved in the business of selling insurance. Voyager Life and Voyager Guaranty and other Voyager Companies are all owned by American Bankers Insurance Company. *See* Deposition of Thomas McCraw p. 11. The individual defendants, Margaret Lois Williamson, Lou Ann Simmons, and Doris Fowler Wells, are all employees of ICC who at the time that all of the named plaintiffs obtained their loans, worked in ICC's Talladega branch. *See* ICC's Responses 234–36 to Plaintiff's Request for Admission. Plaintiffs are four individuals who obtained various loans from ICC's Talladega office from May 1992 to February 1993. *See* ICC Exhibits 1–A through 1–H.

By a May 16, 1985 agreement entitled "Security Instrument Non–Filing Insurance Agreement", ICC named as the insured on the document entered into an agreement with Voyager Insurance Companies[7] where-by Voyager Guaranty agreed to indemnify ICC against any direct loss that ICC may sustain by reason of having taken, received, made advances on, made loans against or extended credit upon an instrument, as security for a loan to a customer of ICC but only insofar as ICC would be damaged through being prevented from (a) obtaining possession of the property represented by such instrument and/or retaining the proceeds thereof and/or (b) enforcing it rights under such instrument solely as the result of the failure of ICC duly to record or file the instrument with the proper public office or public office. *See* Plaintiffs' Exhibit 18.[8] This agreement was in effect at the times that all of the loans that are the subject of this action were made. According to ICC and Voyager Guaranty, the only parties to the agreement, ICC was the insured under this agreement and Voyager Guaranty was the insurer. The premium on this insurance is paid by ICC, and ICC in turn charges a "non-filing" fee to its customers. This fee, in turn, becomes the premium on the non-filing insurance and 100% of this fee is forwarded to Voyager Guaranty. *See* Deposition of Thomas McCraw p. 27. Voyager Guaranty retains ten percent of these premiums, and the other ninety percent is placed into a reserve which is drawn upon as ICC files monthly claims with Voyager Guaranty pursuant to the agreement. *See* Deposition of Thomas McCraw pp. 22–24.

On June 11, 1982, ICC obtained permission pursuant to the "other business" requirement of *Ala.Code* § 5–18–14 (1975)[9] from the Su-

---

5. Although all named parties have filed motions for summary judgment, which would tend to convey to the court that there are no disputed material facts, plaintiffs in their briefs now state that with regard to certain claims, there are facts in dispute. Thus, plaintiffs' motion should be regarded as one for partial summary judgment.

6. Non-filing insurance or "lien insurance" protects a creditor against an imperfect lien due to a "no-filing" of a UCC–1 form to protect a security interest. *See* Deposition of Thomas McCraw p. 19.

7. The name "Voyager Insurance Companies" appears at the top of the Security Instrument Non–Filing Insurance agreement. However, according to Voyager Guaranty and Thomas E. McCraw, Senior Vice President of Operations of Voyager Insurance Companies, this agreement was actually between Voyager Guaranty and ICC. The name "Voyager Insurance Companies" was used to make filing easier in various states because "there were a number of property insurance companies that were affiliated through voyager". *See* Deposition of Thomas McCraw p. 15–16.

8. The exhibits referenced in the depositions submitted by plaintiffs are all combined and numbered sequentially. Plaintiffs have referred these exhibits simply by their number, and the court will do the same.

9. Section 5–18–14 is part of the Small Loan Act and states that no licensee shall conduct the business of making loans pursuant to the act in any office or place of business where any other business is solicited or engaged in unless three days notice is given to the Supervisor of the Bureau of Loans for the State Banking Department.

pervisor of the Bureau of Loans for the State Banking Department to write AD & D policies as an agent of North American Insurance Company. On June 16, 1989, ICC obtained permission to sell AD & D as "other business" in its Talladega, Alabama and Anniston, Alabama offices. *See* ICC's Exhibit Number 3–B. On December 6, 1983, Vernon Connor, Assistant Vice President of Voyager Life Insurance, received a letter from the Supervisor of the Bureau of Loans of the State Banking Department stating that there was no objection to the sale of AD & D in small loan companies provided that the policies would not be a condition to receiving the loan or a part of the credit transaction. *See* Plaintiffs' Exhibit 120. On October 1, 1987, ICC and Voyager Life entered into an agency agreement for the sale of AD & D insurance. By this agreement, Voyager Life granted ICC the authority to solicit insurance on the lives of debtors of ICC. *See* Deposition of Thomas McCraw p. 163; Plaintiffs' Exhibit 45. However, at the time that this agreement was entered into, ICC was an out of state corporation not licensed to sell insurance in Alabama. *See* Deposition of Thomas McCraw p. 166. The individual defendants, employees of ICC, were licensed by the state of Alabama to sell credit disability insurance. *See* ICC's Exhibits 6–A through 6–C. The individual defendants were not licensed to sell ordinary life or ordinary disability insurance in Alabama. *See* Individual Defendants Response 17 to Plaintiffs' Requests for Admission. According to ICC and Voyager Life, the individual defendants were acting as agents of Voyager Life in the sale of the AD & D insurance, and the commission earned on the sale of the AD & D policies was received by ICC as a result of a waiver of commission issued by the individual defendants. The individual defendants were only compensated as employees of ICC. *See* Deposition of Thomas McCraw pp. 167–170; ICC's Response 54 to Plaintiffs' Requests for Admission. On June 24, 1990, ICC made written inquiry to A.L. Blythe, Assistant Commissioner of the Alabama Department of Insurance, concerning the license necessary to sell AD & D. On this same letter, Mr. Blythe wrote, "AD & D insurance is covered under Credit Disability Line." *See* ICC's Exhibit 4.

On May 6, 1992, plaintiff Douglas Martin obtained a loan from ICC's Talladega, Alabama office. The "Security Agreement/Promissory Note" reveals that the amount financed was $1257.40. *See* ICC's Exhibit 1–A. In conjunction with this loan, Martin was sold a policy of AD & D insurance by defendant Margaret Lois Williamson. The face value of the policy was $10,000 with a 24 month premium of $70.00. *See* ICC's Exhibit 2–A. Martin was not charged a fee for lien insurance in connection with this loan. On August 3, 1992, Douglas Martin obtained a second loan from ICC's Talladega office. The amount financed in this loan was $3315.18. *See* ICC's Exhibit 1–B. Martin also purchased a policy of AD & D in connection with this loan from defendant Margaret Lois Williamson. The face value of this policy was $10,000 with a $70.00, 24 month premium. *See* ICC's Exhibit 2–B. Martin was not charged for lien insurance in connection with this loan. *See* ICC's Exhibit 1–B. On November 17, 1992, Douglas Martin obtained a third loan from ICC with the amount financed shown as $1651.08. *See* ICC's Exhibit 1–C. Martin obtained a policy of AD & D in connection with this loan with a face value of $3000 and a 24 month premium of $72.00. *See* ICC's Exhibit 2–C. Martin was charged $15.00 for lien insurance in connection with this loan, but this amount was later refunded to him. *See* ICC's Exhibit 1–C. Finally, on February 17, 1993, Douglas Martin obtained a fourth loan from ICC with the amount financed shown as $3317.48. *See* ICC's Exhibit 1–D. Martin was not charged a fee for lien insurance but did obtain a $3000 policy of AD & D with a 24 month premium of $72.00. *See* ICC's Exhibits 1–D and 2–D. This policy was sold to plaintiff Martin by defendant Lou Ann Simmons.

On August 7, 1992, plaintiff Timmy Mitchell obtained a loan from ICC's Talladega, Alabama office with the amount financed shown as $406.74. *See* ICC's Exhibit 1–E. In connection with this loan, Timmy Mitchell was sold a policy of AD & D insurance by defendant Margaret Lois Williamson with a face value of $3000 and a 12 month premium of $35.00. *See* ICC's Exhibit 2–E. Timmy Mitchell was not charged a fee for lien insurance. *See* ICC's Exhibit 1–E.

On November 9, 1992, plaintiff Denise Davis obtained a loan from ICC's Talladega, Alabama office with the amount financed shown as $482.25. *See* ICC's Exhibit 1–F. Davis was charged a $12.90 fee for lien insurance and was sold an AD & D policy by defendant Doris Wells with a face value of $3000 and a $36.00, 12 month premium. *See* ICC's Exhibits 1–F and 2–F. On January 15, 1993, Denise Davis obtained a second loan from ICC. The total amount financed on this loan was $493.00. Davis was not charged for lien insurance but purchased a $3000 AD & D policy from defendant Lou Ann Simmons with a 12 month premium of $36.00. *See* ICC's Exhibits 1–G and 2–G.

On December 29, 1992, plaintiff Thelma Mitchell obtained a loan from ICC's Talladega, Alabama office in the amount of $635.28. Thelma Mitchell was charged a fee of $13.20 for lien insurance and was sold a policy of AD & D insurance with a face value of $3000 and a 12 month premium of $36.00. Defendant Williamson signed the loan document, and defendant Lou Ann Simmons signed the AD & D policy. *See* ICC's Exhibits 1–H and 2–H.

The charges for lien insurance, where applicable, and the premiums for AD & D insurance on all of the plaintiffs' loans were not included in the finance charge on any of these loans.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. The movant

can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23, 106 S.Ct. at 2552–53; *see* Fed.R.Civ.P. 56(a) and (b).

Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.,* 477 U.S. at 248, 106 S.Ct. at 2510. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249, 106 S.Ct. at 2510–11.

*ANALYSIS*

This memorandum will address each of the remaining counts separately and in order.

I. *COUNT I: Violation of the Mini Code*

Count I of plaintiffs' complaint seeks relief under the Mini–Code of Alabama, *Ala.Code* § 5–19–1 et seq. The only remaining plaintiff in this count is Douglas Martin, and the only remaining defendant in this count is ICC. Plaintiff Martin alleges that in connection with his four loans, ICC has imposed excessive finance charges in violation of the act. Martin alleges that ICC has imposed an excessive finance charge by requiring him to purchase a policy of AD & D in connection with each of his loans and then not including the premiums for such policies in the finance charge.[10] Plaintiff Martin also argues that

---

10. *Ala.Code* § 5–19–1(1) defines the term "Finance Charge" for purposes of the Mini–Code.

This section states that the term "finance

ICC has imposed an excessive finance charge by assessing a charge for lien insurance in connection with his November 17, 1992 loan that did not represent "insurance in lieu of perfecting a security interest", and thus, was improperly excluded from the finance charge.[11]

### A. "AD & D Policies"

■ In order for plaintiff Martin to succeed on the argument that ICC violated the Mini–Code by assessing an excessive finance charge, Martin must show that the premium received for the purchase of the AD & D policy was imposed as an "incident to the extension of credit." *Ala.Code* § 5–19–1(1).[12] If the purchase of the AD & D policies was imposed as an "incident to the extension of credit" then the amount assessed as a premium for this insurance constitutes a finance charge as defined by section 5–19–1(1) and should have been included in the finance charge on each of Martin's four loans. Douglas Martin was sold an AD & D policy in connection with each of the four loans that he obtained from ICC, and all four of the AD & D policies sold to plaintiff Martin contain the following phrase above the plaintiff's signature:

I acknowledge and declare that I have voluntarily purchased this insurance, and said purchase has not been compulsory. I also acknowledge that this insurance is offered neither as a condition nor as a part of a credit transaction.

*See* ICC's Exhibits 2–A through 2–D. Plaintiff Martin attempts to controvert this undisputed and compelling evidence in several ways. He offers his own deposition testimony to show that the purchase of AD & D was required.[13] Plaintiff Martin stated that the first time that he had ever seen the language above his signature on the AD & D policies was during his deposition. When asked why he did not see this language when he signed the insurance documents, Martin stated:

"Because when I went in there to sign the papers, it was flipped up, sign here, flip up, sign here."

. . . . .

"I didn't flip it up."

*See* Deposition of Douglas Martin p. 34. Martin also stated that every time he went in to obtain a loan he asked, "how come I got to have all of this insurance" and that the response was always, "you've got to have the insurance to get the loan." *See Id.* at 31, 41, 47. However, Martin did state that no one prevented him from reading the insurance agreement he was signing. *See Id.* at 33–35. Further, on the two loans dated August 3, 1992 and February 17, 1993, Martin elected not to purchase credit life and credit disability, and on the two loans dated May 6, 1992 and November 17, 1992, plaintiff signed twice indicating that he wanted credit life and credit disability. *See* ICC's Exhibits 1–B, 1–D, 1–A and 1–C. This is clear evidence suggesting that Martin contemplated or at least acknowledged the purchase of credit life and credit disability. This evidence is also in direct contradiction to Martin's argument that he was told that he had to have all of this insurance to obtain a loan. *See* Depo-

charge" shall include all charges payable directly or indirectly by the debtor and imposed directly or indirectly by the creditor as an incident to the extension of credit, but not including ... "the premium for insurance in lieu of perfecting a security interest in property, points or discount paid by someone other than the debtor ..." *Id.*

**11.** Again, *Ala.Code* § 5–19–1(1) would require that all charges imposed as an incident to the extension of credit to be included in the finance charge.

**12.** Section 5–19–1(1) states that the term finance charge does not include premiums for permissible insurance "as provided by this chapter." Section 5–19–20 contains the types of insurance that are permissible. AD & D is not one of the types of insurance set forth in section 5–19–20.

**13.** ICC argues that this deposition testimony is not admissible evidence because allowing such testimony would violate the parole evidence rule. However, as argued by plaintiff Martin, the parole evidence rule does not operate to exclude testimony in an action between a party to the instrument (Martin) and a third party (ICC). The parole evidence rule only operates to prohibit variance of a writing when the controversy at issue is between the parties to the agreement. *Shelby County v. Baker*, 269 Ala. 111, 110 So.2d 896 (1959). And, as argued by plaintiff Martin, the AD & D policy is a policy of insurance between Douglas Martin and Voyager life not between Martin and ICC. Plaintiffs' state, "Thus, by its own testimony, ICC is a stranger to the insurance application ..." *See* Plaintiffs' Reply Brief p. 3.

**1526**

sition of Douglas Martin p. 10. Plaintiff Martin is an adult who can read and write the English language. *See* Plaintiffs' Response 1 to ICC's Request for Admission. Plaintiff Martin is certainly capable of understanding the provision above his signature in the AD & D polices. On four separate occasions, plaintiff signed each of these policies, and the fact that he did not read them is to his detriment and inconsequential to the question at hand. He was certainly not prevented from so doing.

Plaintiff Martin also attacks the validity of the acknowledgment in the AD & D policy by arguing that although the acknowledgment states that the insurance was not offered as a condition or as a part of a credit transaction, ICC's own employee, Margaret Williamson stated that AD & D is sold as a part of the credit transaction. *See* Deposition of Margaret Lois Williamson p. 88. This argument is without merit. Defendant Williamson never stated that the purchase of AD & D insurance was required before a debtor could obtain a loan. Martin, in arguing that his deposition does not violate the parole evidence rule, stated that the insurance agreement was actually between Martin and Voyager Life. Therefore, in light of this contention, for Martin to now argue that the AD & D was a part of the loan transaction is especially unconvincing. By arguing that the insurance agreement was not between Martin and ICC, plaintiff further proves that the loan and the purchase of the AD & D insurance were two separate transactions and that the purchase of the AD & D insurance was not a part of or a condition to the loan.[14] The court is satisfied that uncontroverted evidence shows that the purchase of AD & D insurance in connection with Douglas Martin's four loans was not required by ICC and thus was not an "incident to the extension of credit", and that the amounts charged to plaintiff Martin as a premium for AD & D insurance on each of his four loans was properly excluded from the finance charge.

**B. *"Lien Insurance"***

■ Plaintiff Martin bases his argument that ICC improperly excluded a charge for "lien insurance" from the finance charge in connection with his November 17, 1992 loan on three separate grounds: Martin first argues that the Security Instrument Non–Filing Insurance Agreement between Voyager Guaranty and ICC does not shift the risk of loss from ICC to Voyager Guaranty, and thus, does not meet the definition of insurance under the laws of the state of Alabama. Martin grounds this argument on the fact that the Security Instrument Non–Filing Insurance Agreement between Voyager Guaranty and ICC contains a provision limiting any loss payable to the value of the property represented by the security instrument. In addition, the document provides that the maximum aggregate amount that ICC may claim shall not exceed 90% of ICC's premiums cumulatively collected and paid to Voyager Guaranty. *See* Plaintiffs' Exhibit 18. Because of this provision, plaintiff Martin argues that claims of ICC under this policy will never exceed the amount that ICC has paid in premiums. Further, Martin argues that the fact that Voyager pays on all of the claims virtually "without question" shows that Voyager Guaranty has no risk of loss in relation to these claims.[15] Thus, argues Martin, the agreement between ICC and Voyager Guaranty is not a policy of insurance but actually a self-insurance agreement whereby Voyager Guaranty is simply an administrator of premiums collected by ICC, and the amount collected as charge for lien insurance was not for "*insurance* in lieu of perfecting a security interest in property" and should have been included in the finance charge on Martin's November 17, 1992 loan. The court finds plaintiff's risk of loss argument to be without merit. In *Strength v. Alabama Department of Finance, Division of Risk Management,* 622 So.2d 1283 (Ala.1993), the Ala-

---

**14.** The affidavit of Larry Barton does not further Martin's argument. The fact that loan proceeds were used to purchase the AD & D insurance has no effect on whether the purchase of AD & D was required or imposed as an incident to the extension of credit. It is also of little consequence that AD & D was sold in 95% of ICC's loans.

**15.** In his deposition, Thomas McCraw, Senior Vice President of Operations of Voyager Insurance Companies, stated that Voyager Guaranty pays whatever claims are filed under the Security Instrument Non–Filing Insurance agreement up to the 90% limit with "no questions asked." *See* Deposition of Thomas McCraw p. 42.

bama Supreme Court, in comparing insurance and self-insurance stated:

> Insurance exists when a *contractual relationship* between the *insurer and the insured shifts* to the insurer the *risk of loss* of the insured. Self-insurance is the *assumption of risk* of his *own* loss by *one* having an insurable interest.

*Id.* at 1288 (emphasis added). In evaluating whether a document between the State of Alabama and its employees, which contained stringent limitations on liability, constituted an insurance agreement between an insurer and insured, the Alabama Supreme Court in *Strength* stated that under the arrangement the State (the insurer) incurred a risk of loss in providing for employee indemnity where no risk had previously existed. Thus, reasoned the court, the arrangement involved a shift in risk from the State's employees to the State itself, up to the limit of liability. The court also noted that this limitation of liability is a characteristic that is noticeably absent in the self-insurance context. *Id.* at 1288. The court concluded by stating that the instrument in question also clearly contemplated and defined the rights and duties of more than one party and that "[t]he relationship thus bears all the notable characteristics of insurance and not of those typically identified with self-insurance." *Id.* at 1288–89. In this case, the evidence submitted reveals that under the Security Instrument Non–Filing Insurance Agreement, Voyager Guaranty incurred a risk of loss in providing coverage for any loss as a result of ICC's failure to duly record or file an instrument with the proper public official. No such risk arises on the part of Voyager Guaranty without this agreement, and thus, the risk of loss is shifted from ICC to Voyager Guaranty. Under the agreement, should ICC lose any collateral as a result of not filing a financing statement, Voyager Guaranty is required to indemnify ICC subject to the 90% limitation. In his deposition testimony, Thomas McCraw stated that once the premiums were paid to Voyager Guaranty by ICC, those monies belonged to Voyager Guaranty and not ICC. ICC is only allowed to recover this money upon the filing of a proper claim with Voyager Guaranty. *See* Deposition of Thomas McCraw pp. 21, 27. Further, this Security Instrument Non–Filing Insurance Agreement clearly defines the rights and duties of more than one party.[16] Therefore, the court is satisfied that the risk of loss in connection with non filing of a financing statement was clearly shifted from ICC to Voyager Guaranty, and plaintiff Martin's argument to the contrary is unconvincing.

■ Martin's second contention in support of his argument that the charge for lien insurance in connection with his November 17, 1992 loan was improperly excluded from the finance charge is that the insurance obtained by ICC is actually "bad debt" insurance rather than insurance against loss of a lien. In support of this argument, Martin shows that in her deposition, defendant Margaret Lois Williamson, ICC's employee in the Talladega branch tendered as ICC's witness for transactions which directly concern the local branch, described three criterion that had to be established before a claim for non-filing insurance could be made with Voyager Guaranty. Ms. Williamson stated, "My understanding were three requirements to file a claim: no payment in six months, a non-file fee charged to the customer and collateral on the note. *See* Deposition of Margaret Lois Williamson p. 195. Although, the deposition testimony of defendant Williamson does raise some doubt as to her belief as to what was required to recover under the non-filing insurance agreement, her belief does not alter the clear language of the agreement. Further, any bad faith on the part of ICC or its employees in making claims under this agreement is a matter to be resolved between ICC and Voyager Guaranty. The potential or alleged bad acts of ICC or its

---

16. Plaintiff's argument that there is only one legal entity, ICC, that is a party to this agreement is without merit. Although this document contains the name "Voyager Insurance Companies" as the party with whom ICC has made this agreement, clearly Voyager Guaranty intended to be bound by this agreement and, in fact, performed pursuant to this agreement. Further, the evidence shows that ICC, likewise, performed pursuant to this agreement. ICC knew where to send the premiums and knew how to file and with whom to file a claim pursuant to the agreement. The parties to this agreement knew who to look to for performance, and the fact that a generic name for all Voyager entities appears at the top of the agreement does not change the binding nature of the agreement and the actual parties that were bound thereby.

employees do not alter the nature of the agreement between the parties. Plaintiff also attempts, in support of this "bad debt" argument, to show examples of instances where ICC filed a claim with Voyager involving non-parties for the amount of the outstanding debt and not for the value of the property subject to the security interest. Plaintiff asserts in such examples that no attempt was made to recover the property subject to the security interest. This evidence goes beyond the evidence and material contemplated by the court's March 31, 1994 order. There is no evidence or allegation that ICC ever filed a claim with Voyager Guaranty for recovery under the Security Instrument Non–Filing Insurance Agreement with regard to the November 17, 1993 loan to Douglas Martin.[17] The clear language of the agreement shows that ICC would recover upon being prevented from obtaining possession of the property represented by a security agreement or being prevented from enforcing its rights under such security agreement. No claim was filed by ICC with regard to any of the loans to Douglas Martin, and there is no evidence that Douglas Martin ever defaulted on this or any other loan. Thus, with regard to plaintiff Martin, there is no evidence that the charge for lien insurance, a charge that was ultimately refunded to Martin, was actually for bad debt insurance.

■ The third argument in support of plaintiff Martin's contention that a charge for lien insurance was improperly excluded from the finance charge of his November 17, 1992 loan is that the charge was imposed in addition to perfecting a lien rather than "in lieu of perfecting a lien" as required by the Mini–Code. It is undisputed that plaintiff Martin was charged a $15.00 fee for lien insurance in connection with the November 17, 1992 loan he obtained from ICC. *See* ICC's Exhibit 1–C. This loan was secured by a 1973 Ford

pickup and a 1979 Fairmore mobile home. *Id.* It is also undisputed that at the time that Martin obtained this loan and was charged a fee for lien insurance, these same two items which were pledged as security for this loan were the subject of a previous security agreement between Douglas Martin and ICC and that ICC had filed a UCC–1 financing statement covering these two items. *See* ICC's Responses 196–208 to Plaintiffs' Requests for Admission. Thus, argues Martin, at the time of the execution of the November 17, 1992 loan, ICC was in fact already perfected as to the items of collateral, and therefore, the amount charged for lien insurance was not in "in lieu of perfecting a security interest" as required by the act but was actually in addition to perfection, and as such should have been included in the finance charge. The finance charge on the November 17, 1992 loan is shown to be $328.92, and ICC has admitted that this is the maximum rate permitted by the Mini–Code. *See* ICC's Response 70 to Plaintiffs' Requests for Admission. Thus, if the fee charged to plaintiff Martin for lien insurance were added to the finance charge, the finance charge would necessarily then exceed the maximum rate permitted by the Mini–Code.[18] The court agrees with plaintiff Martin, and the undisputed evidence clearly shows that he was charged a $15.00 fee for lien insurance in addition to perfection rather than in lieu of perfection and that this amount should have been included in the amount financed because only fees for insurance in lieu of perfection are excluded from the definition of a finance charge.

*Ala.Code* § 5–19–19 (1975) establishes liability of a creditor making excess finance charges. This section requires any creditor charging a finance charge in excess of the amount authorized to forfeit the finance charge and refund to the debtor the total amount of the finance charge.[19] Therefore,

---

**17.** In fact, there is no evidence or allegation that ICC filed a claim with Voyager Guaranty under the Security Instrument Non–Filing Insurance Agreement with regard to any of the loans of the named plaintiffs.

**18.** ICC also makes this admission although doing so with the reservation of an objection that the request calls for a conclusion of law, invades the province of the court, and is beyond the scope of discovery permitted by the court's March 31,

1994 order. *See* ICC's Response 131 to Plaintiffs' Request for Admission.

**19.** This section allows for recovery of twice the finance charge or ten times the excess charge together with a reasonable attorney's fee in instances where the debtor has made demand upon the creditor to refund. By admission of plaintiff Martin, there has been no such demand in this case.

pursuant to this section, plaintiff Douglas Martin is entitled to a refund of $328.92 [20] which constitutes the finance charge on the November 17, 1992 loan.[21]

In summary, plaintiff Douglas Martin's motion for summary judgment as to Count I, violation of the Mini–Code by improperly excluding the premiums for purchase of AD & D insurance on all four of Martin's loans, will be denied by a separate order. ICC's motion as to violation of the Mini–Code in connection with the sale of AD & D will be granted. Plaintiff Martin's motion for summary judgment as to Count I for violation of the Mini–Code in assessing a $15.00 fee for lien insurance in connection with Douglas Martin's November 17, 1992 loan will be granted to the limited extent that a judgment in favor of Martin and against ICC in the amount of $328.92 will be entered. ICC's motion for summary judgment as this particular violation will be denied.

## II. *Count II: Truth in Lending Act*

In this count, all four named plaintiffs allege a violation of the Truth in Lending Act, 15 U.S.C § 1601 *et seq.* ("TILA"), against ICC who is the only defendant charged in this count. Plaintiffs argue that ICC has violated the TILA through two separate courses of conduct: 1) excluding from the finance charge the premium imposed in the sale of AD & D insurance to each of the plaintiffs and 2) excluding from the finance charge the fee for lien insurance charged to

plaintiffs Douglas Martin, Thelma Mitchell, and Denise Davis.[22]

### A. *AD & D Policies*

With regard to the sale of AD & D policies to each of the four named plaintiffs in connection with each of their loans, plaintiffs argue that the amount charged to each of them as a premium for AD & D insurance should have been calculated in the finance charge. Section 1605 of the TILA defines the term finance charge and states:

> Except as otherwise provided in this section, the amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit ...

15 U.S.C. § 1605(a). Plaintiffs' argument that the premiums for AD & D insurance should have been included in the finance charge admittedly turns on whether the purchase of the AD & D policies was a required feature of the consumer loans. If the insurance was required, then it was imposed as an "incident to the extension of credit", and the premium amounts should have been included in the finance charge of each of the named plaintiffs' loans. Although, plaintiffs filed a motion for summary judgment as to this count, they now argue in their brief that there are facts in dispute as to whether the AD & D insurance was required and that

**20.** Martin asserts that this amount should be $343.92 which constitutes the finance charge shown on the loan plus the $15.00 fee for lien insurance that should have been included in the finance charge. Although disputed as to the time of the refund, it is undisputed that the amount of the fee was refunded to Martin's account. Thus, $15.00 of the $343.92 has already been recovered by Martin, and the remaining recovery is $328.92.

**21.** Martin also argues that this $15.00 charge was made in deliberate violation or in reckless disregard of the provisions of the Mini–Code. Section 5–19–19 provides that in such situations, the creditor shall have no right to receive the principal or finance charge and the transaction shall be void. *Id.* There is simply no evidence of deliberate violation or reckless disregard in this case. Margaret Lois Williamson stated in deposition testimony that the $15.00 fee charged to Martin in connection with the November 17, 1992 loan was a mistake and that Douglas Mar-

tin was never mistakenly charged a fee for lien insurance in connection with any of his other loans. *See* Deposition of Margaret Lois Williamson pp. 108–109, 126. In fact, Martin was not even charged a fee for lien insurance on any of his other loans. Further, the evidence shows that Martin was refunded for this finance charge after the mistake was discovered, although the date on which this refund was made is disputed. Plaintiff has attempted to show such willful violation by referencing loans and charges regarding individuals not a party to this suit. These alleged instances have no bearing as to whether the fee charged plaintiff Martin was done in deliberate violation of the act or in reckless disregard of the act.

**22.** Plaintiff Timmy Mitchell was not charged a fee for lien insurance in connection with his only loan of August 7, 1992. *See* ICC's Exhibit 1–E.

summary judgment for violation of the TILA in excluding these premiums from the finance charge is premature. The court does not agree and is satisfied that undisputed facts clearly demonstrate that AD & D insurance was not required in connection with any of the loans of the four plaintiffs.

As to plaintiffs Thelma Mitchell, Denise Davis, and Timmy Mitchell, it is undisputed that each signed an AD & D policy in connection with each of their loans containing the exact acknowledgment previously discussed in connection with Douglas Martin's November 17, 1992 loan.[23] *See* ICC's Exhibits 2–E through 2–H. Further, in her deposition testimony, plaintiff Thelma Mitchell stated the following:

Q: Was there anything that prevented you from reading the papers you signed when you made this loan with Columbus Finance?

A: No, sir.

*See* Deposition of Thelma Mitchell p. 24.

Q: All right. And looking at Exhibit 9 (the AD & D policy) that you signed on one place, was any part of it covered up when you signed it?

A: Not that I know of.

Q: And nobody on that occasion, and by that "that occasion" I mean December 29, 1993 when you made this loan to purchase this insurance, told you that you had to buy insurance to get the loan, did they?

A: No sir.

*See Id.* at p. 25–26.

Q: When you left the office they gave you a copy of all the papers you had signed?

A: Yes, sir.

Q: and you took those with you?

A: Uh-huh (affirmative).

*See Id.* at p. 27. Plaintiff Thelma Mitchell also stated that she went through and signed all of the documents presented to her without reading any of them and that no one told her not to read the documents or prevented her from doing so. *See Id.* at p. 12. In her deposition testimony, plaintiff Denise Davis stated the following:

Q: Did anybody ever tell you that you had to take certain kinds of insurance in order to get this loan?

A: No.

Q: And were you prevented from reading any of those documents before you signed them?

A: I didn't get a chance to read them because they were given to me simultaneously, sign it, sign it. So it wasn't like they gave me ample time to read them.

Q: Well, was there any reason why you couldn't stop the giving process in order to read them?

A: No one stopped me, no one hindered me from reading.

*See* Deposition of Denise Davis p. 12. In his deposition testimony, plaintiff Timmy Mitchell stated the following:

Q: Now look at Exhibit Number 11 (the AD & D policy). The language right above your signature there that Mr. Martin read out to us. Did you read that before you signed it?

A: No, sir.

Q: Was there anything to prevent you from reading that?

A: No, sir.

. . .

Q: Did anybody tell you you've got to have insurance if you want to make this loan?

A: No, sir.

*See* Deposition of Timmy Mitchell p. 13–14. The acknowledgment forms plus these three plaintiffs' own testimony unquestionably shows that AD & D insurance was not required in connection with any of their loans.[24] There is no evidence that anyone ever told Thelma Mitchell, Timmy Mitchell or Denise Davis that the insurance was required, and no one prevented any of them from reading the acknowledgment above their signatures.[25] With regard to plaintiff Douglas Martin's argument that the TILA was violated by

---

**23.** Again, Thelma Mitchell obtained a loan from ICC on December 29, 1992. Denise Davis obtained loans from ICC on November 9, 1992 and January 15, 1993. Timmy Mitchell obtained a loan from ICC on August 7, 1992. *See* ICC's Exhibits 1–E through 1–H.

**24.** Plaintiffs' adhesion contract argument is, at best, weak and unconvincing.

**25.** Interestingly, these three plaintiffs depositions, especially the deposition of Thelma Mitchell demonstrate that the plaintiffs have little knowledge of why they are bringing this action or how they have been damaged.

excluding the premiums for AD & D from the finance charge of each of his loans, the court is satisfied, for the reasons stated in the previous discussion under the Mini–Code, and undisputed evidence shows that AD & D insurance was not required in connection with any of Martin's four loans, and thus, was properly excluded from the finance charge on each of these loans. A separate order will be entered denying plaintiffs' motion for summary judgment for violation of the TILA by excluding premiums for AD & D insurance from the finance charge on each of the plaintiffs' loans. The motion of ICC for summary judgment on this issue will be granted.

### B. *"Lien Insurance"*

■ In connection with the fee for lien insurance charged on the loans to Douglas Martin (only the 11/17/92 loan), Thelma Mitchell, and Denise Davis (fee charged only on 11/9/92 loan), plaintiffs argue that such fees were not properly excluded from the finance charge.[26] Section 1605(d)(2) of the TILA allows a creditor to exclude from the finance charge the premium payable for any insurance in lieu of perfecting any security interest otherwise required by the creditor in connection with the transaction. Plaintiffs argue that the fee charged for "lien insurance" was in fact not for lien insurance. Plaintiffs base this argument on the following: 1) the Security Instrument Non–Filing Insurance Agreement does not shift the risk of loss to the insurer, thus rendering the agreement a form of self-insurance; 2) the manner of making and paying claims under the agreement renders the agreement a form of default insurance; and 3) the fee for "lien insurance" is imposed in addition to perfecting rather than in lieu thereof.

For the reasons stated in the previous discussion under Count I, the court is satisfied that the risk of loss was shifted by virtue of the Security Instrument Non–Filing Insurance Agreement from ICC to Voyager Guaranty. Thus, the agreement was not a policy of self-insurance. Likewise, for the reasons stated in the previous discussion under count I, the court is satisfied that the Security Instrument Non–Filing Insurance Agreement between ICC and Voyager Guaranty represents insurance coverage by Voyager Guaranty in the event that ICC suffers a loss for having failed to perfect a security interest and does not represent a policy of bad debt insurance.

There is no allegation that plaintiffs Thelma Mitchell and Denise Davis were charged a fee for lien insurance in addition to perfection, and there is no evidence before the court showing that a UCC–1 financing statement was filed in connection with these two plaintiffs' loans. Therefore, plaintiffs' third basis for ICC's violation of the TILA in excluding the fee for lien insurance from the finance charge only applies to the November 17, 1992 loan to Douglas Martin.[27] It is undisputed that Douglas Martin was incorrectly assessed a fee for lien insurance in connection with the November 17, 1992 loan. Thus, the amount of the fee, $15.00, should have been included in the finance charge. Section 1640 of the TILA imposes civil liability for actions involving credit transactions under the TILA. However, section 1640(c) entitled "Unintentional Violations; Bona Fide Errors" states that a creditor may not be held liable under section 1640 for a violation of the subchapter involving consumer credit if the creditor, by a preponderance of the evidence, shows that the error was not intentional and resulted from a bona fide error. 15 U.S.C. § 1640(c). Although the question of whether the error in charging Douglas Martin $15.00 for lien insurance was a bona fide mistake would normally be a jury question, the undisputed relevant evidence in this case, when viewed in a light most favorable to the plaintiff Douglas Martin, clearly shows that the charge for lien insurance in connection with his November 17, 1992 loan was a simple mistake. It is undisputed that Martin's account was recredited the $15.00.[28] Douglas Martin was not assessed a fee for

---

26. Again, plaintiff Timmy Mitchell was not charge a fee for lien insurance in connection with his only loan from ICC on August 7, 1992. *See* Plaintiffs' Exhibit Number 9.

27. As previously discussed, Martin was not charged a fee for lien insurance in connection with any of his other three loans.

28. ICC argues that this amount was recredited in October 1993. However, plaintiffs convincingly argue and show that Douglas Martin's ledger

lien insurance in connection with any of his other three loans. Margaret Williamson stated in her deposition testimony that this charge for lien insurance was a mistake and that this was the only time, to her knowledge, that such a mistake had been made. *See* Deposition of Margaret Williamson p. 125–127.[29] Therefore, plaintiffs' motion for summary judgment as to Count II for violation of the TILA in improperly excluding the fee for lien insurance in connection with the loans to Douglas Martin, Thelma Mitchell and Denise Davis will be denied. ICC's motion for summary judgment as to this issue will be granted.

### III. COUNT IV: FRAUDULENT MISREPRESENTATION[30]

This claim is only asserted by the three plaintiffs that were charged a fee for lien insurance in connection with their loans, Douglas Martin, Thelma Mitchell, and Denise Davis.[31] Count IV is asserted by these three plaintiffs against ICC, Voyager Guaranty, and the three individual defendants. Plaintiffs Martin, Davis, and Thelma Mitchell argue that the defendants misrepresented to them that the charge denominated as "lien insurance" on their respective loans was for the purchase of insurance in lieu of perfecting a security interest in property when, in fact, the fee was for an additional, undisclosed finance charge. *See* Plaintiffs' Complaint at Count IV. The essential elements of a fraud claim in Alabama are: 1) a misrepresentation of a material fact; 2) made willfully to deceive, or recklessly without knowledge; 3) which was justifiably relied upon by the plaintiff under the circumstances; and 4) which caused damage as a proximate consequence. *Harris v. M & S Toyota, Inc.*, 575

So.2d 74, 76 (Ala.1991). With regard to plaintiffs Denise Davis and Thelma Mitchell, the court is satisfied, for the reasons previously stated in the discussion under count I, that Denise Davis and Thelma Mitchell were properly assessed a fee for lien insurance and that such a fee was forwarded to Voyager Guaranty as a premium pursuant the Security Instrument Non–Filing Insurance Agreement between ICC and Voyager Guaranty. The overwhelming, undisputed evidence shows that this fee was charged and properly excluded from the finance charge as insurance "in lieu of perfecting a security interest in property." Thus, defendants could not have *misrepresented* to Denise Davis and Thelma Mitchell that the fees were for insurance in lieu of perfection when, in fact, the evidence clearly shows that this is precisely what the fees were for.

With regard to plaintiff Douglas Martin, it is undisputed that Martin was incorrectly charged a fee for lien insurance in connection with his November 17, 1992 loan. However, for the reasons stated in connection with the discussion under Count II, the court is satisfied and the evidence, viewed favorably toward the plaintiff, is clear that this incorrect charge was not made willfully or recklessly and does not rise to the level of fraudulent misrepresentation.[32] A separate order will be entered denying plaintiffs' motion for summary judgment as to count IV and granting ICC, Voyager Guaranty, and the individual defendants' motions for summary judgment as to Count IV.

### IV. COUNT V: BREACH OF FIDUCIARY DUTY

Count V is brought by all four named plaintiffs against ICC and the individ-

---

card at ICC did not reflect the refund until April 15, 1994, a date after the initiation of this suit. *See* Deposition of Margaret Williamson p. 133; Plaintiffs' Exhibit 75.

**29.** Plaintiffs have attempted by referencing other transactions involving non-parties to show that this charge was in fact deliberate and not an error. These alleged instances have little bearing on the court's decision as to whether the November 17, 1992 charge for lien insurance to Douglas Martin was in fact a mistake.

**30.** Count III was dismissed by the court's August 9, 1994 order.

**31.** Timmy Mitchell was not charged a fee for lien insurance by ICC and is not a party to this count.

**32.** The fact that the simple claim for misrepresentation in Count VI of plaintiffs' complaint was dismissed while the claim for fraudulent misrepresentation was allowed to remain would be somewhat puzzling since a claim for mistaken misrepresentation requires a significantly reduced level of intent. However, the reason for the dismissal may lie in the fact that punitive damages are not available in a claim for mistaken misrepresentation.

ual defendants and is based upon the plaintiffs' claim that ICC and the individual defendants owed the plaintiffs the duties of an insurance broker with respect to the sale of plaintiffs' AD & D insurance. Plaintiffs argue that because the individual defendants were only licensed to sell credit life and credit disability insurance and because the individual defendants and ICC admit that the AD & D policies were not sold as credit life or credit disability, See ICC's Responses 77–80 to Plaintiffs' Request for Admission; Individual Defendants Responses 31, 32 to Plaintiffs' Request for Admission,[33] the individual defendants were unlicensed to sell the AD & D policies. Plaintiffs reference the affidavit of Ralph Blythe, Jr. in support of the contention that although ICC received permission on May 27, 1982 from the Supervisor of the Bureau of loans of the Alabama State Banking Department to sell AD & D insurance as "other business activity"[34], See ICC's Exhibit 3–A; this permission to sell AD & D insurance was granted again to ICC for the Talladega office on June 16, 1989, See ICC's Exhibit 3–B; and Mr. Blythe himself responding to a letter from ICC requesting a statement concerning the necessary license for the sale of AD & D insurance, stated that AD & D "is covered under credit disability line, See ICC's Exhibit 4, the AD & D insurance must be marketed as Credit Life or Credit Disability and that an agent selling AD & D insurance which is not marketed as Credit Life or Credit Disability would be required to obtain a license for the sale of ordinary life insurance. Because the individual defendants were unlicensed to sell the AD & D insurance, argue plaintiffs, they automatically became insurance brokers rather than insurance agents who then owed a fiduciary responsibility to the insureds

rather than the insurer.[35] Ala.Code § 27–8–1(c) defines the term insurance broker and states as follows:

> An insurance broker is any individual, partnership or corporation who, for compensation, *not being a licensed agent for the company in which a policy of insurance is placed,* acts or aids in any manner in placing risks or effecting insurance for a party other than himself or itself ...

*Id.* Even if it is assumed that the individual defendants were not licensed to sell AD & D insurance,[36] the court is satisfied that they were not automatically transposed into the role of an insurance broker the moment they sold a policy of insurance they allegedly were not licensed to sell. It is undisputed that the individual defendants were licensed agents for the company in which a policy of insurance was placed. Each of the individual defendants was licensed to sell credit life and credit disability. A reading of the statute as proposed by plaintiffs is, in the court's opinion, inappropriate and would, in many instances where the agent has acted wrongfully, allow the principal insurance company to escape liability. Therefore, a separate order will be entered granting the individual defendants motion for summary judgment as to count V. Plaintiffs' motion will be denied.

Count V is also brought against defendant ICC. Plaintiffs argue that because of the October 1, 1987 agency agreement between ICC and Voyager Life appointing ICC as an agent to sell AD & D insurance, *See* Plaintiffs' Exhibit 45, ICC was also acting as a broker under Alabama law and, thus, breached its fiduciary duty to plaintiffs in the sale of the AD & D insurance. It is undisputed that ICC is not licensed for the sale of insurance in Alabama. However, although the agency agreement between ICC and

33. Although it is unclear, the court assumes that credit disability is another name for credit accident and health.

34. *Ala.Code* § 5–19–20 states the type of insurance that a creditor may offer under the Mini-Code. This section does not mention AD & D insurance. However, section 5–18–14 allow the conduct of "other business" on the same premises from which loans are made if written notice is given to the Supervisor of the Bureau of loans. The Supervisor may then order, after an investigation, that this "other business" be discontinued.

35. *Ala.Code* § 27–8–4(c) states that an insurance broker shall be regarded as acting as a representative of the insured rather than the insurer.

36. Actually, the court is satisfied that the undisputed evidence lends to a conclusion that the individual defendants were licensed to sell AD & D insurance. Summary judgment in favor of the individual defendants is also appropriate, as an alternative ground, for this reason.

Voyager Life is puzzling, ICC's name appears nowhere on any of the AD & D policies. The name "Voyager Life Insurance Company" appears at the top of each of the policies. The policies are signed by the plaintiffs and the licensed agents of Voyager Life.[37] There is no evidence that these policies were sold to the plaintiffs by ICC. The loan and the sale of the AD & D policies were made in two separate transactions. The individual defendants knew for whom they were acting as agents. Voyager Life knew that the individual defendants were acting as its agents in the sale of AD & D insurance. And, ICC was aware of who the individual defendants were representing in the sale of the AD & D insurance. Therefore, defendant ICC's motion for summary judgment as to count V will be granted. Plaintiffs' motion will be denied.

## V. *COUNT VII: FRAUDULENT CONCEALMENT* [38]

 Count VII is brought by all four plaintiffs against the individual defendants and ICC and alleges a violation of *Ala. Code* § 6–5–102 which is entitled "Suppression of Material Facts" and reads as follows:

> Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.

*Id.* Plaintiffs argue that defendants have violated this statute by failing to disclose that AD & D was not required; that AD & D could be procured elsewhere at a lower cost; that defendants would receive a personal benefit from the sale of AD & D; and that the defendants were not licensed to sell AD & D. The elements of a fraudulent suppression claim under section 6–5–102 are: 1) the

suppression of a material fact; 2) that the defendant was under a duty to communicate; 3) because of the confidential relationship between the parties or the circumstances of the case; and 4) which caused injury as a proximate consequence. *Crowder v. Memory Hill Gardens, Inc.*, 516 So.2d 602, 604 (Ala.1987). It should first be noted that there is no question that the undisputed evidence shows that the fact that AD & D was not required in connection with the loan was disclosed. As previously indicated, the court is satisfied that the signed acknowledgments along with each of the four named plaintiffs' deposition testimony establishes such disclosure. Thus, any fraudulent suppression claim in regard to concealment of this information is baseless.[39] The claim that ICC fraudulently suppressed that they were not licensed to sell AD & D must also fall. As stated in relation to count V, the court is satisfied that the AD & D policies were not sold by ICC. The mere fact that part of the loan proceeds were used to purchase the AD & D policies does not make ICC a party to the insurance agreements between ICC and the named plaintiffs.[40] As to the claim that the individual defendants fraudulently suppressed that they were not licensed to sell AD & D, even if it is assumed that they were not in fact licensed, as a matter of law under section 6–5–102, one can only be held liable under this section for concealing facts which one has knowledge. *Harrell v. Dodson*, 398 So.2d 272 (Ala.1981). The undisputed evidence clearly shows that the individual defendants believed that they were licensed to sell AD & D. They obtained licenses to sell credit life and credit disability; they were acting as agents of Voyager Life; and the Supervisor of the Bureau of Loans had approved the sale of AD & D. With regard to disclosure that the individual defendants and ICC would benefit from the sale of AD & D

---

37. Although these licensed agents of Voyager Life are employees of ICC, the court is satisfied that with regard to the sale of AD & D they were acting solely in their capacity as agents of Voyager Life.

38. As previously indicated, Count VI was dismissed by the court's March 11, 1994 order.

39. Any argument that ICC is guilty of suppression of the fact that AD & D was not required simply because ICC was not a party in the sale of

the AD & D is without merit. ICC's employees acting as agents for Voyager Life disclosed to the plaintiffs that AD & D was not required.

40. The court is somewhat concerned that it has been lured into a semantic exercise as to who was acting in what capacity at the time of these loans. However, such distinctions appear necessary given the nature of the claims; the alleged violations; and the dual role of the individual defendants.

and disclosure that AD & D might be available elsewhere at a lower price, both plaintiffs and defendants agree that success under this count turns on whether the individual defendants or ICC was under a duty to communicate because of the confidential relationship between the parties or the circumstances of the case. For the reasons stated in relation to count V, the court is satisfied that no confidential relationship existed between the individual defendants and plaintiffs or between ICC and the plaintiffs. Neither the individual defendants nor ICC were transposed into insurance brokers with relation to the sale of the AD & D insurance to the plaintiffs. The duty to disclose under section 6–5–102 can also arise based upon the particular circumstances of the case. However, the Alabama Supreme Court in analyzing the duty to disclose based upon the particular circumstances of a case has held that an obligation to disclose does not arise where the parties to the transaction are knowledgeable and capable of handling their affairs. *See Trio Broadcasters v. Ward,* 495 So.2d 621, 624 (Ala.1986) (*citing Mudd v. Lanier,* 24 So.2d 550 (Ala.1945). The court is satisfied that the plaintiffs in this action are all capable adults who can read and write, and clearly the plaintiffs are capable of handling their own affairs. The facts of this case, even when viewed in a light most favorable to the plaintiffs, do not show that defendants were under a duty to disclose that they would profit from the sale of AD & D insurance or that AD & D might be available elsewhere at a lower price. In order to withstand a motion for summary judgment on a claim of fraudulent suppression, the plaintiff must offer substantial evidence that 1) the defendant had a duty to disclose material facts; 2) that the defendant concealed or failed to disclose these facts; 3) that the suppression induced the plaintiffs to act; and 4) that the plaintiffs' actions resulted in their injury. *Interstate Truck Leasing, Inc. v. Bender,* 608 So.2d 716 (Ala.1992). Plaintiffs

have simply failed to meet their burden, thus, the individual defendants and ICC's motion for summary judgment as to count VII will be denied by a separate order. Plaintiffs' motion will be denied.

## VI. *COUNT VIII: SMALL LOAN ACT*

 Plaintiffs Thelma Mitchell, Timmy Mitchell, and Denise Davis allege that defendant ICC has directly or indirectly contracted for and received premiums of insurance in violation of the Small Loan Act. *Ala.Code* § 5–18–1 *et seq.*[41] For the purposes of the motions for summary judgment as to count VIII, the court will assume that ICC directly or indirectly received the premiums from the sale of the AD & D insurance to the plaintiffs. The next question is whether the sale of AD & D insurance in connection with a small loan is authorized by the Small Loan Act. Section 5–18–15(h) of the small loan acts states as follows:

> No further or other charges shall be directly or indirectly contracted for or received by any licensee, including insurance premiums of any kind, except those specifically authorized by this chapter ...

*Ala.Code* § 5–18–15(h) (1975). Section 5–18–14 states as follows:

> No licensee shall conduct the business of making loans under this chapter within any office, suite, room or place of business in which any other business is solicited or engaged in or in association or conjunction with any other business until three days' written notice of an intention so to do has been given to the supervisor....

*Id.* It is undisputed that ICC is a licensee as defined by the Small Loan Act, and the clear language of the Small Loan Act allows a licensee to receive only those charges specifically authorized by Title 5, Chapter 18 of the *Code of Alabama.* However, section 5–18–14 allows the Supervisor of the Bureau of Loans for the State Banking Department to approve the conducting of "other business" by licensees.[42] Thus, when the Supervisor al-

---

**41.** The loans entered into by plaintiff Douglas Martin are not regulated by the Small Loan act. This is undisputed, and Douglas Martin is not a party to count VIII.

**42.** Plaintiffs' argument that any alleged approval of the Supervisor of the Bureau of Loans is ineffective for the Supervisor's failure to comply

with section 5–18–12 of the Small Loan Act is, at best, frivolous. Section 5–18–12 states how rules, regulations and orders are to be issued. However, section 5–18–14 only requires an order from the Supervisor in instances where he believes that the conduct of "other business" would be in violation of the Small Loan Act. Section 5–18–14 requires no order when the Supervisor

lows for the conducting of other business pursuant to section 5–18–14, charges or premiums for the sale of such insurance would then be authorized pursuant to the act. *See Herndon v. ITT Consumer Financial Corp. et al.,* 789 F.Supp. 720 (W.D.N.C.1992) *aff'd* No. 92–1662, 1994 WL 20106 (4th Cir. Jan. 26, 1994).[43] The court is thus satisfied that ICC has not violated the Small Loan Act by contracting for or receiving charges or premiums in the sale of AD & D policies in connection with loans to the three plaintiffs in this count. ICC's motion for summary judgment as to count VIII will be granted by a separate order. Plaintiffs' motion will be denied.

### VII. COUNT IX: VOID POLICIES SOLD BY UNLICENSED AGENTS

Count IX is brought by all four of the named plaintiffs against defendant Voyager Life, and plaintiffs cite *Derico v. Duncan,* 410 So.2d 27 (Ala.1982) for the contention that a contract made in violation of a regulatory statute is void. Plaintiffs argue that Title 27 of the *Code of Alabama* is a regulatory statute as defined in *Derico* and that Voyager Life has violated Title 27 by allowing its agents to sell insurance which they were unlicensed to sell. Thus, pursuant to *Derico,* plaintiffs argue that the policies of AD & D insurance purchased in connection with each of their loans are null and void. For purposes of plaintiffs' motion for summary judgment as to count IX, the court will assume that Title 27 of the *Code of Alabama* is a regulatory statute. However, the court is satisfied that the undisputed evidence shows that the individual defendants were properly licensed at the time the AD & D insurance was sold to all of the named plaintiffs. The individual defendants were licensed to sell credit life and credit disability. Voyager Life obtained permission from the Alabama State Banking Department to offer

AD & D to small loan companies. And, ICC made written request to the Supervisor of the Bureau of Loans for the State Banking Department as to the necessary license required in the sale of AD & D. The Supervisor responded by stating, "AD & D insurance is covered under the credit disability line." *See* ICC's Exhibit 4; Plaintiffs' Exhibit 32. This is the information concerning the necessary license in the sale of AD & D that the individual defendants, ICC, and Voyager Life had before it at the time of the named plaintiffs' loans. Therefore, the court is satisfied that defendant Voyager Life, the only defendant in count IX, has not violated the Title 27 in the sale of AD & D to the plaintiffs, and a separate order granting Voyager Life's motion for summary judgment as to count IX will be granted. Plaintiffs' motion as to count IX will be denied.[44]

### SUMMARY AND CLASS ISSUES

For the reasons stated herein, plaintiffs' September 14, 1994 motion for summary judgment will be granted to the limited extent of plaintiff Douglas Martin's claim under count I that defendant ICC violated the Alabama Mini–Code in charging Martin $15.00 for lien insurance when such insurance was in addition to perfection of a security interest rather than "in lieu of perfection" as required by the act. Judgment will be entered in favor of plaintiff Douglas Martin in regard to this charge under count I in the amount of $328.92. Plaintiffs' motion for summary judgment with regard to all other counts and claims against all defendants will be denied. Defendant ICC's September 16, 1994 motion for summary judgment as to count I will be denied with regard to the limited extent that the plaintiffs' September 14, 1994 motion will be granted as discussed above and will be granted as to all other aspects of count I. ICC's September 16, 1994 motions for sum-

approves the "other business". The licensee need only notify the director of its intention to conduct such "other business".

**43.** Plaintiffs argue and this court agrees that the decision in *Herndon* is non-binding. However, the facts and statutory schemes in *Herndon* are remarkably and almost exactly similar to the facts and statutory scheme in this case, and the court agrees with the reasoning and analysis of

the Western District of North Carolina and the Fourth Circuit.

**44.** Plaintiffs' argument that based upon *Bay Shore Properties v. Drew Corp.,* 565 So.2d 32 (Ala.1990) the AD & D policies are voidable by the plaintiffs is baseless. As previously stated, the individual defendants and ICC were not acting as agents of the plaintiffs.

mary judgment with regards to counts II, IV, V, VII, and VIII will be granted. Voyager Guaranty's September 16, 1994 motion for summary judgment will be granted. Voyager Life's September 16, 1994 motion for summary judgment will be granted. The individual defendants' September 16, 1994 motion for summary judgment will be granted. In addition, the court finds no reason for delaying the entry of final judgment with regard to the individual claims of the named plaintiffs, and the judgment to be entered will expressly direct such an entry.

Although all of the individual claims of the named plaintiffs will be resolved by a final judgment, claims still remain with regard to putative class members. Fed.R.Civ.P. 23(c)(1) states that as soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it be so maintained. However, the timing provision of Rule 23(c)(1) is not absolute, and under proper circumstances, as exist in this case, where early resolution of motions for summary judgment would save the court and parties from needless and costly litigation and where the parties would not suffer significant prejudice it would seem permissible and not an abuse of discretion for the court to rule on the motions for summary judgment without deciding the class certification issue. *See Wright v. Schock,* 742 F.2d 541 (9th Cir.1984); *Pharo v. Smith,* 621 F.2d 656 (5th Cir.1980) (affirming summary judgment where no ruling on class certification had been made). At the outset of this case, the court expressed its concern over the extensive discovery, time and expense that would likely be involved on the class certification issue, and the court finds it reasonable to rule on the motions for summary judgment without deciding on class certification. The defendants have consented to the court pursuing the individual claims of the named plaintiffs before the pursuit of any class claims, and no putative class member will be prejudiced by the court's ruling. They remain entirely free to hire their own attorneys and to pursue their own claims, and judgment as to the named plaintiffs will not be res judicata as to any other members of the putative class. Therefore, Because a final judgment will be entered with regard to the individual claims of the named plaintiffs, by a separate order, the court will express its intention to dismiss all claims of any putative class members unless the parties by July 17, 1995 show cause why such claims should not be dismissed.