William L. Strength, Jr., Martha S. Strength, and Charles L. Carroll appeal from a summary judgment entered in favor of the Division of Risk Management, a division of the Alabama Department of Finance ("the DRM"), in an action filed by the DRM seeking a declaration of the extent of its liability to indemnify Carroll from the State Employees' Liability Insurance Fund. We affirm in part; reverse in part; and remand.
In 1983, the legislature enacted Act No. 83-521, 1983 Ala. Acts 809, which established the State Employees' Liability Insurance Fund ("the Fund"), in order to "provide for the protection of state employees . . . for certain wrongful acts or omissions committed while in the performance of their official duties in the line and scope of their employment through the purchase of liability insurance or through the self-insurance of the several state departments, agencies, boards or commissions." (Codified at Ala. Code 1975, §36-1-6.1.) This section provides in pertinent part:
 "(a) The various state agencies, departments, boards or commissions shall determine and report their needs for liability coverage to the finance director, the insurance commissioner, and the attorney general. The finance director, with the advice of the insurance commissioner and attorney general, shall then determine the type of blanket policy needed to provide basic coverage for deaths, injuries, or damages arising out of the negligent or wrongful acts or omissions committed by state employees or agents of the state. . . . Any policy of insurance or reinsurance shall be selected by the finance director on a competitive bid basis for an initial period of three years with a provision for annual review. . . .
 "(b) The finance director, with the advice of the insurance commissioner and the attorney general, may provide for self-insurance of the entire state or any part of the state under such terms and conditions as the finance director shall determine. . . .
". . . .
 "(d) The charges or costs of the liability insurance or self-insurance provided under the provision of this section shall be paid from the funds appropriated for the operation of the several state departments, agencies, boards, or commissions. The finance director may apportion the costs or charges to the several state departments, agencies, boards or commissions in order to cover the risk involved."
On September 27, 1984, the state finance director issued to "all department heads" a memorandum regarding "employee liability insurance." The memorandum stated in part:
 "Effective October 1, 1984, the State will insure all State employees according to the terms and conditions of a policy to *Page 1285 
be furnished in the near future. Coverage will be as follows:
 "$500,000 Each Employee [emphasis added]
"$1,000,000 Limit Per Occurrence
 "The State will function as a self-insurer with reinsurance protection afforded after the first $2 million in claims. The cost will be $45 per employee this year, which includes a pro rata share of the first $1 million self-retention, plus cost of reinsurance, and a small administrative charge. If claims exceed the first $1 million, an additional charge per employee will be necessary
[emphasis original].
Four days later, the Fund[1] issued the following instrument, which, in pertinent part, provided:
"GENERAL LIABILITY TRUST FUND
"State of Alabama
 "COMPREHENSIVE GENERAL LIABILITY INSURANCE
"LIMITS OF LIABILITY — EACH PERSON $500,000
"LIMITS OF LIABILITY — EACH OCCURRENCE $1,000,000
". . . .
 "RENEWAL: This coverage is to be continuous unless notice of cancellation is given to the participating entity by the General Liability Trust Fund, hereinafter referred to as 'The Fund.' Premiums are subject to annual adjustments, and premium notices will be directed to each participating entity prior to the expiration date. . . .
"PART I — COVERAGE:
 "The insurance afforded by this policy applies only to occurrences or happenings or events on or after the above stated Inception Date, and during the effective period of any renewal of this policy.
 "This policy covers the following: PERSONAL INJURY, BODILY INJURY, SICKNESS, DISEASE OR DEATH AND PROPERTY DAMAGE caused by or resulting from error, omission or negligence in the performance of duties within the scope of an insured's employment with a participating entity that has purchased coverage prior to the date of the occurrence.
 "In consideration of the payment of the appropriate premium, and subject to all of the limitations as set forth in this policy or any addendum hereto, the Fund hereby agrees that it will provide the following coverage:
 "A) Comprehensive general liability insurance.
The Fund will pay on behalf of any insured, all sums which the insured shall become legally obligated to pay as damages, court costs and attorney fees, because of bodily injury, property damage or personal injury resulting from any job related occurrences caused by any insured. The limitation on the Fund's liability under this section shall be as stated in the declarations attached hereto and made a part of this policy;
provided, however, where damages are incurred as a combination of bodily injury, property damage or personal injury, all such damages shall be combined in calculating the total liability of the Fund for any one occurrence caused by an insured and the total liability of the Fund shall not exceed the per occurrence coverage as set forth in the declarations attached hereto.
". . . .
"PART II — LIMITS OF LIABILITY
 "The limits of liability of the Fund under this policy shall be as stated in the declarations attached hereto and made a part hereto. The limit of liability for each type of coverage stated per occurrence shall constitute the limit which the Fund shall be legally liable to pay to any person or persons, regardless of (1) the *Page 1286 
number of insured persons and entities under this policy or (2) the number of persons or organizations who sustain injury or damage, or (3) the number of claims made or suits brought on account of such injury, for each occurrence covered by this policy. The limits of liability indicated as the annual aggregate of the Fund for each type of coverage as set forth in the declarations attached hereto and made a part of this policy
shall constitute the total extent of the Fund's liability for all occurrences of the type covered during each twelve month period during which this policy is in effect, irrespective of (1) the number of insured persons and entities under this policy (2) the number of persons or organizations who sustain injury or damage resulting for [sic] the acts of an insured or (3) the number of claims made or suits brought on account of injury or damages occasioned by an occurrence caused by an insured under this policy. For the purpose of determining the limit of the Fund's liability under this policy, all bodily injury, property damage, or personal injury arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one act or occurrence.
"PART III — DEFINITIONS
". . . .
 "(d) 'Insured' means any person employed, appointed, elected, hired or allowed to assume a temporary or permanent position or office in or with the State of Alabama or any of its departments, bureaus, offices, agencies, authorities, or boards.
". . . .
"PART V — CONDITIONS
 "(1) NOTICE. In the event of any occurrences every insured shall be responsible to provide written notice as soon as practicable to the Attorney General of Alabama. . . .
"(2) SUITS. . . .
 "(3) The insured shall cooperate with the Fund as well as any representative thereof, and upon request of the Fund, shall attend hearings and trials and shall assist in effecting settlement and obtaining the attendance of witnesses. The insured
shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur an expense other than for such emergency medical attention to others as may be imperative at the time of the occurrence. The failure of the insured
to cooperate with the Fund shall terminate the Fund's liability under this policy.
 "(4) No action shall lie against the Fund unless, as a condition precedent thereto, there shall have been full compliance with all of the terms and conditions of this policy or until the insured's obligation to pay shall have been finally determined either (1) by judgement [sic] against the insured at the trial or (2) by written agreement of the claimant, and the Fund. . . .
 "(5) In the event of any payment under this policy, the Fund shall be subrogated to all of the insured's rights of recovery therefore [sic] and against any person or organization and the insured shall execute and deliver all instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights.
 "(6) Notice to, or knowledge possessed by, any representative of the Fund or by any other person shall not effect a waiver or a change in any part of this policy or estop the Fund from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.
 "(7) There shall be no assignment of this contract.
". . . .
 "(9) This contract shall be delivered in the State of Alabama, shall be a contract made under and pursuant to the laws of the State of Alabama, and shall be governed by and construed under and in accordance with the laws of the State of Alabama. *Page 1287 
". . . .
 "(13) OTHER INSURANCE. The insurance provided in this policy shall be excess over any other valid and collectible insurance available to any insured;
provided however that this shall not reduce the maximum coverage provided by this policy."
(Emphasis added.)[2]
On August 28, 1986, the Strengths sued Carroll, an investigator employed by the Alabama Attorney General's office; they sued pursuant to 42 U.S.C. § 1983 in the United States District Court for the Middle District of Alabama. The complaint alleged that Carroll had conspired with others to initiate a meritless forgery prosecution against the Strengths. The Strengths sought damages for violations of rights guaranteed by U.S. Const. amends. IV, VI, and XIV. The DRM notified Carroll that it would defend him against these claims under a reservation of "all rights and privileges afforded by applicable statutes and the guidelines of the Fund."
On June 16, 1991, the DRM filed an action in the Montgomery County Circuit Court (subsequently transferred to Autauga County) against Carroll and the Strengths, requesting a judgment declaring that its liability, if any, to the Strengths for the conduct of Carroll was limited to an aggregate of $500,000, that is, "one benefit for all claims asserted by the Strengths." In his answer to the complaint, Carroll alleged that the Fund had breached the "enhanced obligation of good faith" imposed by the rule set forth in L S Roofing SupplyCo. v. St. Paul Fire Marine Ins. Co., 521 So.2d 1298 (Ala. 1987), upon an insurer that defends under a reservation of rights. Carroll also sought a judgment that he was "entitled to separate liability benefit limits for the claims asserted by William Strength and Martha Strength," that is, $1,000,000. The Strengths moved to compel production of the bulk of the DRM's claim file. All parties moved for partial summary judgments on the issue of the amount of benefits available from the Fund. The trial court entered a summary judgment in favor of the DRM, holding that its liability for Carroll's alleged misconduct was limited to $500,000. The trial court also denied the Strengths' motion to compel production of the claim file.[3]
Carroll and the Strengths raise three issues on appeal: (1) whether the relationship between Carroll and the Fund, created by the instrument pursuant to § 36-1-6.1, represents that of insurer and insured; (2) whether the "limits of liability" clause in the instrument is to be interpreted as limiting the Fund's liability to $500,000 per employee, or to $500,000 per injured claimant; and (3) whether the DRM is subject to (a) the rule set forth in L S Roofing, and (b) the "general body of insurance law" developed by the decisions of this Court.
 I. The Relationship
The Strengths and Carroll contend that the relationship is that of insurer and insured, and that that relationship is evidenced by the instrument issued on October 1, 1984, which, they insist, is an insurance policy. Therefore, they argue, the interpretation of the instrument's limits of liability clause is subject to rules regarding the construction of contracts.
The DRM contends that the State is merely functioning as aself-insurer under the instrument, which, it contends, is not to be interpreted as an insurance policy, but, rather, as a set of administrative guidelines promulgated by a state agency. It argues that the limitation of liability clause in the instrument is ambiguous; insists that construction of the clause must, therefore, include a consideration of the state finance director's memorandum; and, moreover, contends that its construction of the instrument is entitled to "substantial deference" as an interpretation of agency regulations by the promulgating agency. See Personnel Bd. of Jefferson County v. *Page 1288 Bailey, 475 So.2d 863 (Ala.Civ.App. 1985); see also GlenMcClendon Trucking Co. v. Hall Motor Express, Inc., 285 Ala. 98, 229 So.2d 488 (1969).
The resolution of this issue requires a discussion of the distinction between insurance and self-insurance — they are not synonymous concepts. United States v. Newton LivestockAuction Market, Inc., 336 F.2d 673, 676 (10th Cir. 1964). Indeed, self-insurance is "the antithesis of insurance as that term is commonly used." Universal Underwriters Ins. Co. v.Marriott Homes, Inc., 286 Ala. 231, 232, 238 So.2d 730, 732
(1970).
"Insurance exists when a contractual relationship between theinsurer and the insured shifts to the insurer the risk of loss
of the insured. Self-insurance is the assumption of risk of hisown loss by one having an insurable interest." 336 F.2d 673,676 (emphasis added). The concept of self-insurance commonly appears in the workers' compensation context "with employers who have elected to carry their own risks and not to insure them with regular carriers," J. Appleman, Insurance Law andPractice § 4601 (1979) (emphasis added); see also Ala. Code 1975, § 32-7-34 (authorizing the self-insurance of persons "in whose name more than 25 motor vehicles are registered" upon proof that those persons are "possessed and will continue to be possessed of ability to pay judgments obtained against such person[s]").
Self-insurance thus typically involves a single-party, noncontractual situation whereas insurance involves a multi-party, contractual relationship. See Ala. Code 1975, §27-1-2 (insurance is "[a] contract whereby one undertakes to indemnify another or pay or provide a specified amount or benefit upon determinable contingencies"). Additionally, self-insurance differs materially from insurance in that the former involves no shift in the risk of loss whereas the latter clearly involves such a shift.
Section § 36-1-6.1 was enacted to protect the employees of the State of Alabama from liability "for certain wrongful acts or omissions committed while in the performance of their official duties," Act No. 83-521, 1983 Ala. Acts 809, not to protect the State. Such provisions are calculated, inter alia, to "create a secure working environment wherein employees do not feel paralyzed in the performance of their duties for fear of being sued." P. Harper, Statutory Waiver of MunicipalImmunity Upon Purchase of Liability Insurance in North Carolinaand the Municipal Liability Crisis, 4 Campbell L.Rev. 41, 72 (1981). Indemnification arrangements are also enacted to create "an incentive for . . . government employees and officers to continue their employment and for new employees and officers to be attracted to government positions," thus enabling government entities to "enlist and maintain a stable and functional workforce." Comment, Waiving Local Government Immunity in NorthCarolina: Risk Management Programs Are Insurance, 27 Wake Forest L.Rev. 709, 715 (1992). This is particularly significant in view of the fact that "the State and its agencies have absolute immunity from suit in any court."[4] Phillips v. Thomas,555 So.2d 81 (Ala. 1989); see also Will v. Michigan Dep't ofState Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45
(1989) (a state is not a "person" for purposes of actions in state court pursuant to § 1983).
Under the arrangement evidenced by the instrument in this case, the State incurs a risk of loss in providing for employee indemnity where, because of its sovereign immunity, no risk previously existed. The arrangement thus involves a shift in risk from the State's employees to the State itself, up to the Fund's limit of liability — a characteristic that is notably absent in the self-insurance context. Additionally, the instrument clearly contemplates and defines the rights and duties of more than one party. The relationship thus bears all *Page 1289 
the notable characteristics of insurance and none of those typically identified with self-insurance.[5]
Moreover, as indicated by the instrument's terminology, the pertinent portions of which are emphasized above, the instrument clearly purports to be a contract of insurance. Its drafters chose to define the rights and duties of the parties in language referable to insurance, rather than to administrative "guidelines." "If it looks like a duck, walks like a duck, and quacks like a duck, it must be a duck. And so it is with this 'duck'; it must be insurance." Comment, WaivingLocal Government Immunity in North Carolina: Risk ManagementPrograms Are Insurance, 27 Wake Forest L.Rev. 709, 715 (1992) (quoting City of Laramie v. Facer, 814 P.2d 268, 273 (Wyo. 1991)). It remains to be determined, however, whether the instrument issued on October 1, 1984, standing alone, constitutes a contract.
 II. Limits of Liability
The requisite elements of an insurance policy, as in contracts, generally, include: an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract. Mercer v. Davis BerrymanInternational, Inc., 834 F.2d 922 (11th Cir. 1987); Gillilan v.Federated Guaranty Life Ins. Co., 447 So.2d 668 (Ala. 1984). The essential terms are set forth in Ala. Code 1975, § 27-14-11:
"(a) Every policy shall specify:
"(1) The names of the parties to the contract;
"(2) The subject of the insurance;
"(3) The risks insured against;
 "(4) The time when the insurance thereunder takes effect and the period during which the insurance is to continue;
"(5) The premium; and
"(6) The conditions pertaining to the insurance.
 "(b) If under the policy the exact amount of premium is determinable only at stated intervals or termination of the contract, a statement of the basis and rates upon which the premium is to be determined and paid shall be included."
(Emphasis added.)
Conspicuously absent from the instrument involved in this case is definite information regarding the premium. "The premium is of the very essence of a contract of insurance, and although the times and amount of payments made are not controlling on the question whether a contract is one of insurance, in order to have a valid contract of insurance, the rate of the premium must be agreed upon, expressly or impliedly." George Couch, Cyclopedia of Insurance Law § 2:5 (1984). An instrument that fails to state the amount of, and duties of the parties with regard to, the premium fails in an essential element, and, therefore, cannot constitute an enforceable contract.
The instrument contains only the following general statements regarding premiums: "Premiums are subject to annual adjustments, and premium notices will be directed to each participating entity prior to the expiration date . . ."; and "[i]n consideration of the payment of the appropriate premium, and subject to all of the limitations as set forth in this policy or any addendum hereto, the Fund hereby agrees that it will provide the following coverage." These cursory statements leave entirely to speculation the amount of the premium.
Missing information regarding a term essential to the formation of a contract may, however, "be established by the circumstances of the case, such as correspondence between the parties." Cyclopedia of Insurance Law § 2:14. In such a case, each communication or document represents "a link in the chain which constitutes the comprehensive contract. Every such communication is a part of the contract, and is not extraneous to it nor in *Page 1290 pais." Air Conditioning Engineers v. Small, 259 Ala. 171, 176,65 So.2d 698, 703 (1953); see also Lawler Mobile Homes, Inc. v.Tarver, 492 So.2d 297 (Ala. 1986). This is such a case.
The essential terms regarding the premium are supplied in the memorandum from the finance director promulgated on September 27. That memorandum states: "The cost will be $45 per employee this year, which includes a pro rata share of the first $1,000,000 self-retention, plus cost of reinsurance, and a small administrative charge." The contract thus necessarily consists of both the instrument, which is insufficient as a free-standing policy, and the finance director's memorandum. Consequently, the memorandum is not parol evidence, as Carroll and the Strengths contend — it is part of the contract.
When viewed in this context, the policy contains no ambiguity as to the scope of its coverage — liability is limited to $500,000 per employee, not, as the Strengths and Carroll contend, $500,000 per claimant. Therefore, the judgment of the trial court as to the extent of the coverage is affirmed.
 III. Discoverability of the Claim File
A. Applicability of L S Roofing.
Carroll and the Strengths contend that the DRM's claim file is discoverable on the ground that it will demonstrate whether the DRM has breached the duty imposed by L S Roofing SupplyCo., Inc. v. St. Paul Fire Marine Ins. Co., 521 So.2d 1298
(Ala. 1987), upon an insurer defending an action against an insured under a reservation of rights. L S Roofing arose out of an action filed by Beaver Construction Company ("Beaver") against L S Roofing Supply Company, Inc. ("L S"), in which Beaver alleged that L S had "breached certain express and implied warranties and [had been] guilty of fraudulent concealment in regard to the sale of . . . roofing materials."Id. at 1299. L S was insured by St. Paul Fire Marine Insurance Company ("St. Paul"). The policy provided: " 'We'll defend any suit brought against you for damages covered under this agreement, even if the suit is groundless or fraudulent. We have the right to investigate, negotiate and settle any suit or claim if that seems proper and wise.' " Id.
L S employed its own counsel, who began a defense in the action. St. Paul subsequently notified L S that it would defend it in the suit, but "that it was reserving its rights to disclaim coverage with respect to certain of the claims in the . . . action." Thereafter, the defense was conducted concurrently by counsel employed by St. Paul and by independent counsel employed by L S.
L S sued St. Paul in a state court, seeking a judgment declaring the scope of its right to control the litigation. The action was removed to the United States District Court for the Northern District of Alabama, which subsequently certified to this Court the following question:
 "Whether, in a situation where (a) the insurer has a contractual duty to provide a defense for all covered claims asserted by a third party against the insured and (b) the insurer elects to provide such a defense under a 'reservation of rights' because some of the claims asserted (or damages demanded) against the insured are not covered by the indemnification portion of the policy, counsel retained by the insurer has such a conflict of interest that the insured is justified in engaging counsel of its choice, with said counsel's reasonable attorney's fees to be paid by the insurer and with said counsel having control over the defense of the litigation against the insured."
521 So.2d at 1298.
In this Court, L S contended that "in all cases where there is a reservation of rights, regardless of the actual circumstances of the defense provided by the insurer, the insured is entitled to defense counsel of its choice who shall control the defense, and whose reasonable fees the insurer is required to pay." Id. at 1304 (emphasis in original). L S argued that such a result was necessitated by the conflict of interests between the insured and *Page 1291 
counsel employed by the insurer for the insured's defense that, it insisted, inheres in all such cases.
We rejected this "absolute" approach, adopting, instead, the rule set forth in Tank v. State Farm Fire Casualty Co.,105 Wn.2d 381, 715 P.2d 1133 (1986), which imposes on an insurer defending under a reservation of rights "an enhanced obligationof good faith toward its insured in conducting such a defense."521 So.2d at 1303 (emphasis in L S Roofing). Thus, we conditioned the right of an insured to control the litigation through its own counsel at the insurer's expense upon a showing that the insurer had breached certain specific conditions enumerated in Tank, including, but not limited to, the duty "'of full and ongoing disclosure to the insured' " of information regarding (1) the progress of the action, (2) the chances of success of the defense, and (3) settlement offers.521 So.2d at 1303 (emphasis in L S).
Having concluded that the relationship involved in this case is that of insurer and insured, we have no difficulty in holding that the relationship should be subject to the rule ofL S Roofing, as explained above. The policy in this case vests control of the litigation, including the power to settle, in the attorney general. More specifically, it provides:
"PART V — CONDITIONS
". . . .
 "(10) Legal representation for all insured[s] under this policy shall be by the Attorney General of the State of Alabama or by any designee properly appointed by the Attorney General pursuant to § 36-15-21, Code of Alabama, 1975. It shall be the sole duty and right of the Attorney General to defend or to refuse to defend any insured in any action hereunder. . . .
". . . .
 "(11) The decision to settle a claim, prior to the filing of any action at law, shall be the responsibility of the Attorney General, coordinating with the Board of Adjustment.
 "(12) The decision to settle any action shall be the responsibility of the Attorney General.
Otherwise, settlement is to be mutually agreed on by the Attorney General and any other interested insurer(s)."
(Emphasis added.)
The Fund's insureds thus possess under the policy no more control of the litigation than did the insured in L SRoofing, and the dangers of conflict of interests are no less substantial under the Fund's policy than under the one involved in that case. To hold that the State, in defending an insured under a reservation of rights, need not comply with the rule ofL S Roofing, which seeks "to put in place a procedure by which the insured can be confident that his interests will not be compromised nor in any way subordinated to those of the insurer as a result of the defense he is required to accept under the contract of insurance," 521 So.2d at 1304, hardly comports with the purpose of § 36-1-6.1 and similar statutes, that is, to provide a sense of security for employees. See Note, Pulling the Nails Out of the Avallone Coffin: ShouldExcess Liability Coverage on a Self-Insurance Fund Constitute aWaiver of Sovereign Immunity?, 20 Stetson L.Rev. 971, 985 (1991).
This conclusion is not inconsistent with Doe v. Swift,570 So.2d 1209 (Ala. 1990), in which we declined the appellant's invitation to "expand the protection authorized by [§ 36-1-6.1] so as to cover all acts by state employees, regardless of whether such acts were done 'while in the performance of their official duties in the line and scope of their employment.' "570 So.2d at 1210 (emphasis added.) Holding that the State must comply with the obligation of good faith explained in L SRoofing does not "expand" the coverage authorized by §36-1-6.1, but merely implements the statute's stated purpose.
 B. Applicability of the "General Body" ofInsurance Law
In their briefs, Carroll and the Strengths contended that if the instrument is an insurance policy, then the DRM "is bound by *Page 1292 
the body of insurance law as expounded in the decisions of this Court that govern and define the relationship and respective duties and rights of an insurer and its insureds." Brief ofAppellants, at 19 (emphasis added). This proposition is far too broad and ambiguous to apply to the relatively unique relationship created by the policy in this case. Indeed, little imagination is required to conceive of a number of principles contained in that body of law that could not apply to the State because of its sovereign immunity.
Carroll and the Strengths have not cited supporting authority for the application of any specifically identified principles. See Ala.R.App.P. 28(a)(5); Lewis v. State, 518 So.2d 214, 220
(Ala.Crim.App. 1987). Thus, although we are aware of numerous potentialities contingent upon the success of the Strengths' § 1983 claims, we prefer to restrict our holdings to the issues that were thoroughly argued and briefed in this case.
Because we hold that the motion to compel production of the claim file cannot be denied on the ground of the inapplicability of L S Roofing, the judgment of the trial court is, to the extent that it denies the motion to compel, reversed, and the cause is remanded for proceedings consistent with this opinion. However, the judgment is, to the extent that it declared the coverage to be $500,000 per employee, affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MADDOX, SHORES, HOUSTON, and KENNEDY, JJ., concur.
STEAGALL, J., recused.
[1] The DRM was subsequently created specifically to "carry out the provisions of section 36-1-6.1." Act No. 90-672, 1990 Ala. Acts 1300 (codified at Ala. Code 1975, §§ 41-4-300 to -306). Before the formation of the DRM, the Fund was administered by a board composed of the state finance director, the insurance commissioner, and the attorney general.
[2] The "premiums" were paid by the several departments according to the number of employees in the departments.
[3] The court held that the DRM was not subject to the rule set forth in L S Roofing and that its claim file was, therefore, not discoverable.
[4] Ala. Const. 1901, § 14, provides: "[T]he State of Alabama shall never be made a defendant in any court of law or equity."
[5] When considered in the context of the purpose of § 36-1-6.1, the legislature, in authorizing the administrators of the Fund to "provide for self-insurance," § 36-1-6.1(b), obviously used the term "self-insurance" as empowering the State itself to insure its employees, rather than to insure itself, as the technical definition of the term requires.