[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 571 
On February 7, 2005, John Raley sued James Allen Main, in his capacity as finance director of the State of Alabama; Troy King, in his capacity as the attorney *Page 572 
general of the State of Alabama; the State of Alabama General Liability Trust Fund ("the Fund"); and the State of Alabama (these defendants are collectively hereinafter referred to as "the State defendants"). He also named as a defendant Joyce Sharpley, in her capacity as the administratrix of the estate of her deceased husband, James Sharpley. Raley sought a judgment declaring whether the State defendants were obligated to provide him a defense and indemnification in an action brought by Sharpley against him in the United States District Court for the Northern District of Alabama, Northeastern Division. The State defendants answered the complaint asserting certain affirmative defenses and generally denying that they were obligated to defend or indemnify Raley in the federal litigation.
On May 18, 2005, Raley moved the trial court for a summary judgment contending that he was entitled to a defense from the Fund as to the claims asserted by Sharpley in the federal litigation and to indemnification from the Fund should any damages be awarded Sharpley. On August 15, 2005, Sharpley responded in support of Raley's motion, contending that Raley was entitled to a defense and to indemnification from the Fund. On August 18, 2005, the State defendants responded to Raley's motion for a summary judgment and filed their own motion for a summary judgment, arguing, among other things, that the trial court lacked subject-matter jurisdiction, that the controversy at issue is reserved to the legislative and executive branches of government, and that the State defendants were immune from suit pursuant to Art. I, § 14, Alabama Constitution of 1901.
On August 22, 2005, Sharpley responded to the State defendants' motion for a summary judgment. On August 24, 2005, Raley responded to the State defendants' motion for a summary judgment and presented the affidavit of his attorney, Donald R. Rhea, in support of his response.
Following a hearing, the trial court, on September 13, 2005, entered an order granting Raley's motion for a summary judgment in part, finding that Raley was entitled to a defense from the Fund in the federal litigation; however, the trial court denied Raley's motion to the extent that it sought indemnification and granted the State's motion in that respect, finding that Raley was not entitled to indemnification from the Fund should a judgment be entered against him in the federal litigation.
On September 30, 2005, Raley and Sharpley moved the trial court to alter, amend, or vacate its judgment of September 13, 2005, as to the issue of indemnification. On October 4, 2005, the State defendants moved the trial court to alter, amend, or vacate its judgment of September 13, 2005, as to the issue of a duty to defend. The parties' postjudgment motions were denied by operation of law; all parties appeal.
 Facts
The facts giving rise to the federal court litigation were set forth by the Alabama Court of Criminal Appeals in an unpublished memorandum affirming Raley's manslaughter conviction, Raley v. State (CR-02-0983, August 22, 2003), 886 So.2d 183 (Ala.Crim.App. 2003)(table):
 "At around 3:30 p.m. on the afternoon of July 6, 2001, James Edward Sharpley and Brian Wagar were driving home from work in Sharpley's automobile on Interstate 565 in Limestone County, when Sharpley pulled into the emergency lane on the right-hand side of the highway and began illegally passing vehicles. In one of those vehicles was the appellant, John Barry Raley, a game warden with the Alabama Department of Conservation. Raley, who was driving *Page 573 
his marked game-warden truck, activated his flashing blue lights and pursued Sharpley with the intent of pulling him over and giving him a ticket for reckless driving. After seeing Raley's blue lights, Sharpley pulled his car over to the side of the highway near an overpass and stopped. Sharpley then got out of his car and walked toward Raley, who had pulled his truck in behind Sharpley. However, when Sharpley realized that Raley was a game warden, he turned around and got back in his car and drove away, telling his passenger Wagar that `it wasn't a cop' and that Raley did not have the authority to pull him over.
 "Raley began to pursue Sharpley again, this time with his blue lights flashing and his siren on. Shortly thereafter, Sharpley turned off the highway and pulled into a service station just off the interstate. Raley followed Sharpley's car into the service station parking lot, intending to complete the traffic stop.
 "After stopping at the service station, Sharpley exited his car, leaving the driver's door open, and again approached Raley's truck. According to a statement that Raley later gave police, Sharpley was agitated and began angrily disputing Raley's legal authority to conduct traffic stops. Raley, however, advised Sharpley that he did have authority to make traffic stops and demanded to see Sharpley's driver's license. Testimony indicated that Sharpley then told Raley that he would get his license for him and started to walk back to his car. According to Brian Wagar, Raley followed closely behind Sharpley and then put his hand on Sharpley's shoulder. At this, said Wagar, Sharpley angrily told Raley, `[G]et your f****** hands off me. I'm getting my license.' Raley's grand jury testimony indicated that Raley feared Sharpley was going to his car to get a gun.
 "After Raley took his hand from Sharpley's shoulder, Sharpley leaned into his car through the open driver's door and asked Wagar, who had remained in the passenger's seat, to hand him his driver's license. Wagar, who did not know where Sharpley kept the license, began looking for it. At that time, according to testimony, Sharpley reached inside the car and retrieved the license from the center floorboard, below the car's radio. The evidence showed that as Sharpley started to turn to hand the license to Raley, Raley, thinking that Sharpley was holding a pistol, drew his gun and shot Sharpley once at close range. The bullet entered Sharpley's back at the right armpit and pierced his lung, liver, and heart; he died minutes later. Several witnesses at the service station testified that they saw Raley shoot Sharpley in the back when Sharpley reached into the car. The evidence established that neither Sharpley nor Wagar was armed."
Subsequently, Raley was indicted for "heat-of-passion" manslaughter, see § 13A-6-3(a)(2), Ala. Code 1975.
On January 30, 2002, Sharpley sued Raley, among others, in the United States District Court for the Northern District of Alabama, Northeastern Division, asserting a state law cause of action for wrongful death pursuant to § 6-5-410, Ala. Code 1975, and federal causes of action pursuant to42 U.S.C. § 1983. The risk-management division of the Alabama Department of Finance was notified of the federal civil action pending against Raley. Jerry Carpenter, the risk manager for the Department of Finance ("the Department"), notified Raley by letter on March 11, 2002, that the Fund would provide him with a defense and indemnification in the federal *Page 574 
court litigation subject to certain reservation of rights by the Fund and the Department The letter stated, in relevant part:
 "The State of. Alabama General Liability Trust Fund (the `Fund') has reviewed the above-referenced matter and has determined that, in its present posture, it is unable to determine if the Fund's coverage applies. The complaint alleges intentional acts which may not be covered. We refer you to General Liability, section 9, Exclusions (1) and (1[8]) of the General Liability Trust Fund Guidelines which may apply in this case and which read as follows:
 "`Section 4. Exclusions. This program for indemnification of liability does not apply to the following: "`(1) Any acts or omissions of any Covered Employee not arising out of the performance of a Covered Employee's official duties in the line and scope of employment;
 "`(1[8]) Personal Injury, bodily injury, or property damage expected or intended from the standpoint of the Covered Employee. This exclusion does not apply to Bodily Injury arising from the use of reasonable force to protect persons or property.'
 "The Fund agrees to provide a defense until the matter of coverage can be resolved but the Fund reserves its rights to withdraw from defense or to contest coverage at a later date and reserves to itself all of its Guideline defenses in case the defendant is subsequently found liable."
On April 2, 2002, Donald R. Rhea was appointed a deputy attorney general by the attorney general for the specific purpose of representing Raley in the federal court litigation. On October 18, 2002, Raley was convicted of manslaughter in the Limestone Circuit Court and was sentenced to 10 years' imprisonment. The sentence was suspended, and Raley was placed on two years' supervised probation. On August 22, 2003, Raley's conviction was affirmed by the Court of Criminal Appeals.Raley v. State (CR-02-0983), 886 So.2d 183
(Ala.Crim.App. 2003)(table). This Court denied Raley's petition for a writ of certiorari on December 12, 2003, without an opinion. Ex parte Raley (No. 1030018), 891 So.2d 1014
(Ala. 2003)(table).
Rhea testified in his affidavit in support of Raley's opposition to the State defendants' summary-judgment motion that after he had been appointed to represent Raley, he requested from Carpenter the authority to extend a financial offer to Sharpley in order to bring the federal litigation to a close. Rhea stated that he was given only limited authority by the Department do so. Rhea states that the parties attempted to mediate the federal action but that the Department refused to extend the authorized financial limit that would have assisted in settling the federal court litigation.
After Raley had exhausted all appeals of the manslaughter conviction, the Department, through Carpenter, notified Raley by letter on August 10, 2004, that it was "exercising its right to terminate payment for your defense." The Department based its decision to terminate Raley's defense on the following exclusion contained in the Fund's guidelines:
 "12. Personal Injury, Bodily Injury, or Property Damage resulting from any dishonest, fraudulent, or criminal act or omission of a Covered Employee for which a judgment of conviction has been entered in a criminal prosecution of such Covered Employee."
Raley then filed this declaratory-judgment action. *Page 575 
 Standard of Review
The trial court's judgment was based on undisputed facts and documentary evidence. Thus, rather than apply the standard of review generally applicable to a declaratory judgment, we will apply a de novo standard of review. See Alfa Mut. Ins. Co.v. Small 829 So.2d 743, 745 (Ala. 2002) (holding that "[o]ur review of a declaratory judgment is generally governed by the ore tenus standard of review. However, in cases such as this, where there are no disputed facts and where the judgment is based entirely upon documentary evidence, no such presumption of correctness applies; our review is de novo.").
 Discussion I. Case No. 1050460 and Case No. 1050553
The State defendants contend that they are absolutely immune from Raley's action pursuant to the doctrine of sovereign immunity that has its basis in § 14, Ala. Const. 1901. This Court has stated:
 "Section 14, Ala. Const. 1901, provides `[t]hat the State of Alabama shall never be made a defendant in any court of law or equity.' This section affords the State and its agencies an `absolute' immunity from suit in any court. Ex parte Mobile County Dep't of Human Res., 815 So.2d 527, 530 (Ala. 2001) (stating that Ala. Const. 1901, § 14, confers on the State of Alabama and its agencies absolute immunity from suit in any court); Ex parte Tuscaloosa County, 796 So.2d 1100, 1103
(Ala. 2000) (`Under Ala. Const. of 1901, § 14, the State of Alabama has absolute immunity from lawsuits. This absolute immunity extends to arms or agencies of the state. . . .'). Indeed, this Court has described § 14 as an `almost invincible' `wall' of immunity. Alabama State Docks v. Saxon, 631 So.2d 943, 946 (Ala. 1994). This `wall of immunity' is `nearly impregnable,' Patterson v. Gladwin Corp., 835 So.2d 137, 142 (Ala. 2002), and bars `almost every conceivable type of suit.' Hutchinson v. Board of Trustees of Univ. of Ala., 288 Ala. 20, 23, 256 So.2d 281, 283 (1971). Moreover, if an action is an action against the State within the meaning of § 14, such a case `presents a question of subject-matter jurisdiction, which cannot be waived or conferred by consent' Patterson, 835 So.2d at 142-43.
 "Section 14 prohibits actions against state officers in their official capacities when those actions are, in effect, actions against the State. Lyons v. River Road Constr., Inc., 858 So.2d 257, 261
(Ala. 2003); Mitchell v. Davis, 598 So.2d 801, 806 (Ala. 1992). `In determining whether an action against a state officer or employee is, in fact, one against the State, [a] [c]ourt will consider such factors as the nature of the action and the relief sought.' Phillips v. Thomas, 555 So.2d 81, 83
(Ala. 1989). Such factors include whether `a result favorable to the plaintiff would directly affect a contract or property right of the State,' Mitchell, 598 So.2d at 806, whether the defendant is simply a `conduit' through which the plaintiff seeks recovery of damages from the State, Barnes v. Dale, 530 So.2d 770, 784
(Ala. 1988), and whether `a judgment against the officer would directly affect the financial status of the State treasury,' Lyons, 858 So.2d at 261. Moreover, we note that claims against state officers in their official capacity are `functionally equivalent' to claims against the entity they represent. Hinson v. Holt, 776 So.2d 804, 810
(Ala.Civ.App. 1998); see also McMillian v. Monroe County, Ala., 520 U.S. 781, 785 n. 2, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) (noting that a suit against a governmental officer in his official capacity is the same *Page 576 
as a suit against the entity of which the officer is an agent); Yeldett v. Cooper Green Hosp., Inc., 956 F.2d 1056, 1060 (11th Cir. 1992) (holding that official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent). In this case, the commissioner represents DOC, which, as a department of the State, is entitled to sovereign immunity. Rodgers v. Hopper, 768 So.2d 963, 968 (Ala. 2000) (holding that DOC is entitled to sovereign immunity under § 14, because a judgment against it would be paid from the treasury of the State)."
Haley v. Barbour County, 885 So.2d 783, 788
(Ala. 2004).
However, this Court has recognized certain exceptions to the absolute immunity afforded the State, its agencies, and its officers. Those are as follows:
 "`(1) Actions brought to compel State officials to perform their legal duties. (2) Actions brought to enjoin State officials from enforcing an unconstitutional law. (3) Actions to compel State officials to perform ministerial acts. (4) Actions brought under the Declaratory Judgments Act, [Ala. Code 1975, § 6-6-220 et seq.], seeking construction of a statute and how it should be applied in a given situation.'"
Patterson v. Gladwin Corp., 835 So.2d 137, 142
(Ala. 2002) (quoting Aland v. Graham, 287 Ala. 226,229-30, 250 So.2d 677, 679 (1971)) (citations omitted). Other exceptions include:
 "`(5) valid inverse condemnation actions brought against State officials in their representative capacity; and (6) actions for injunction or damages brought against State officials in their representative capacity and individually where it was alleged that they had acted fraudulently, in bad faith, beyond their authority or in a mistaken interpretation of law."'
Ex parte Alabama Dep't of Transp., 978 So.2d 17, 21
(Ala. 2007) (quoting Drummond Co. v. Alabama Dep't ofTramp., 937 So.2d 56, 58 (Ala. 2006)). "`In determining whether an action against a state officer is barred by § 14, the Court considers the nature of the suit or therelief demanded, not the character of the office of the person against whom the suit is brought.'"Patterson, 835 So.2d at 142 (quoting Ex parteCarter, 395 So.2d 65, 67-68 (Ala. 1980)) (emphasis added inPatterson).
The exceptions cited above are not applicable to overcome the absolute immunity afforded the State of Alabama in this case; therefore, Raley's action against the State of Alabama is barred by § 14, and we dismiss these appeals as to the State of Alabama. See Larkins v. Department of Mental Health Mental Retardation, 806 So.2d 358, 364 (Ala. 2001), holding that a trial court or appellate court should, at any stage of the proceedings, dismiss an action when that action is one against the State and is barred by § 14.
Additionally, although the Fund was named as a defendant by Raley, it is not a legal entity subject to suit. Black'sLaw Dictionary 913 (8th ed. 2004) defines "legal entity" as "[a] body, other than a natural person, that can function legally, sue or be sued, and make decisions through agents." The Fund is a program provided by the State that has as its purpose to provide basic coverage for deaths, injuries, or damages arising out of the negligent or wrongful acts of employees and agents of the State during the course of their employment. The Fund, in and of itself, is incapable of acting independently or through agents. It cannot make policy or carry out policy; its only means of "acting" is through its administration by *Page 577 
the State's finance director. Because the Fund is not a legal entity subject to suit, we also dismiss these appeals as to it. See Ex parte Haralson, 853 So.2d 928
(Ala. 2003).
As for the remaining State defendants (the finance director and the attorney general, hereinafter referred to as "the individual State defendants"), Raley expressly brought this declaratory-judgment action pursuant to § 6-6-220, Ala. Code 1975, to determine the obligations of the State defendants to use the Fund to indemnify him and to provide him with a defense in the pending federal litigation brought by Sharpley. A determination of the obligations of the individual State defendants to Raley under the Fund necessarily requires some interpretation of § 36-1-6.1, Ala. Code 1975, which establishes the Fund, and the applicability of that Code section to Raley's situation. Implicit in this determination is the further consideration of whether the Fund can be compelled to provide, through the individual State defendants, indemnification and a defense to Raley based on a legal duty arising from the Fund guidelines. In such posture, this case presents a combination of the first and fourth exceptions to the State's immunity cited above, i.e., an action brought to compel State officials to perform their legal duties and an action brought under the Declaratory Judgment Act. Accordingly, as to the individual State defendants, we conclude that this action is not barred by § 14 sovereign immunity because it falls within one or more of the exceptions set forth above.
The legislature, in 1983, enacted Act No. 83-521, Ala. Acts 1983, codified at § 36-1-6.1, Ala. Code 1975, which established the Fund for the purpose of providing protection to "state employees . . . for certain wrongful acts or omissions committed while in the performance of their official duties in the line and scope of their employment through the purchase of liability insurance or through the self-insurance of the several state departments, agencies, boards or commissions." Section 36-1-6.1 provides, in relevant part:
 "(a) The various state agencies, departments, boards, or commissions shall determine and report their needs for liability coverage to the Finance Director, the Insurance Commissioner, and the Attorney General. The Finance Director, with the advice of the Insurance Commissioner and Attorney General, shall then determine the type of blanket policy needed to provide basic coverage for deaths, injuries, or damages arising out of the negligent or wrongful acts or omissions committed by state employees or agents of the state. . . . Any policy of insurance or reinsurance shall be selected by the Finance Director on a competitive bid basis for an initial period of three years with a provision for annual review. . . .
 "(b) The Finance Director, with the advice of the Insurance Commissioner and the Attorney General, may provide for self insurance of the entire state or any part of the state under such terms and conditions as the Finance Director shall determine. . . .
 ". . . .
 "(d) The charges or costs of the liability insurance or self-insurance provided under the provision of this section shall be paid from the funds appropriated for the operation of the several state departments, agencies, boards, or commissions. The Finance Director may apportion the costs or charges to the several state departments, agencies, boards or commissions in order to cover the risk involved." *Page 578 
Raley and Sharpley rely on this Court's decision inStrength v. Alabama Department of Finance,622 So.2d 1283 (Ala. 1993), in arguing that an insurer/insured relationship exists between Raley and the Fund. InStrength, the plaintiffs sued the defendant, an investigator employed by the attorney general, in the United States District Court, pursuant to 42 U.S.C. § 1983, alleging that the defendant had conspired with others to initiate a meritless forgery prosecution against them. The division of risk management for the Department notified the defendant that it would defend him under a reservation of "`all rights and privileges afforded by applicable statutes and the guidelines of the Fund.'" 622 So.2d at 1287.
Subsequently, the division of risk management sued the plaintiffs and the defendant in state court seeking a judgment declaring that its liability to the plaintiffs based on the conduct of the defendant was limited to $500,000. The defendant answered the complaint alleging that the division of risk management had breached the enhanced obligation of good faith imposed upon an insurer that defends under a reservation of rights. The defendant also sought a judgment that he was entitled to liability benefits in the amount of $1,000,000. The trial court in Strength entered a summary judgment in favor of the division of risk management.
The plaintiffs and the defendant argued on appeal that an insurer/insured relationship existed between the defendant and the Fund, as evidenced by an instrument issued by the division of risk management, which the plaintiffs and the defendant contended was an insurance policy. The plaintiffs and the defendant argued that because an insurer/insured relationship existed between the defendant and the Fund, the interpretation of the liability clause in the instrument was subject to the rules applicable to contract construction. The division of risk management argued in response that the State was functioning as a self-insurer under the instrument, which it contended was to be interpreted as a set of administrative guidelines rather than as an insurance policy. The instrument in question was issued by the Fund and defined the rights and responsibilities of the parties to the instrument in terms referable to insurance. The instrument in Strength also made general references to insurance premiums.
In holding that the instrument issued by the Fund created an insurer/insured relationship between the defendant and the Fund, this Court discussed the distinction between insurance and self-insurance, stating:
 "The resolution of this issue requires a discussion of the distinction between insurance and self-insurance — they are not synonymous concepts. United States v. Newton Livestock Auction Market, Inc., 336 F.2d 673, 676 (10th Cir. 1964). Indeed, self-insurance is `the antithesis of insurance as that term is commonly used.' Universal Underwriters Ins. Co. v. Marriott Homes, Inc., 286 Ala. 231, 232, 238 So.2d 730, 732 (1970).
 "`Insurance exists when a contractual relationship between the insurer and the insured shifts to the insurer the risk of loss of the insured. Self-insurance is the assumption of risk of his own loss by one having an insurable interest.' 336 F.2d 673, 676 (emphasis added). The concept of self-insurance commonly appears in the workers' compensation context `with employers who have elected to carry their own risks and not to insure them with regular carriers,' J. Appleman, Insurance Law and Practice § 4601 (1979) (emphasis added); see also Ala. Code 1975, § 32-7-34 (authorizing the self-insurance of persons `in *Page 579 
whose name more than 25 motor vehicles are registered' upon proof that those persons are `possessed and will continue to be possessed of ability to pay judgments obtained against such person[s]').
 "Self-insurance thus typically involves a single-party, noncontractual situation whereas insurance involves a multi-party, contractual relationship. See Ala. Code 1975, § 27-1-2
(insurance is `[a] contract whereby one undertakes to indemnify another or pay or provide a specified amount or benefit upon determinable contingencies'). Additionally, self-insurance differs materially from insurance in that the former involves no shift in the risk of loss whereas the latter clearly involves such a shift.
 "Section § 36-1-6.1 was enacted to protect the employees of the State of Alabama from liability `for certain wrongful acts or omissions committed while in the performance of their official duties,' Act No. 83-521, 1983 Ala. Acts 809, not to protect the State. Such provisions are calculated, inter alia, to `create a secure working environment wherein employees do not feel paralyzed in the performance of their duties for fear of being sued.' P. Harper, Statutory Waiver of Municipal Immunity Upon Purchase of Liability Insurance in North Carolina and the Municipal Liability Crisis, 4 Campbell L.Rev. 41, 72 (1981). Indemnification arrangements are also enacted to create `an incentive for . . . government employees and officers to continue their employment and for new employees and officers to be attracted to government positions,' thus enabling government entities to `enlist and maintain a stable and functional workforce.' Comment, Waiving Local Government Immunity in North Carolina: Risk Management Programs Are Insurance, 27 Wake Forest L.Rev. 709, 715 (1992). This is particularly significant in view of the fact that `the State and its agencies have absolute immunity from suit in any court. Phillips v. Thomas, 555 So.2d 81 (Ala. 1989); see also Will v. Michigan Dep't of State Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (a state is not a `person' for purposes of actions in state court pursuant to § 1983).
 "Under the arrangement evidenced by the instrument in this case, the State incurs a risk of loss in providing for employee indemnity where, because of its sovereign immunity, no risk previously existed. The arrangement thus involves a shift in risk from the State's employees to the State itself, up to the Fund's limit of liability — a characteristic that is notably absent in the self-insurance context. Additionally, the instrument clearly contemplates and defines the rights and duties of more than one party. The relationship thus bears all the notable characteristics of insurance and none of those typically identified with self-insurance.
 "Moreover, as indicated by the instrument's terminology, . . . the instrument clearly purports to be a contract of insurance. Its drafters chose to define the rights and duties of the parties in language referable to insurance, rather than to administrative `guidelines.' `If it looks like a duck, walks like a duck, and quacks like a duck, it must be a duck. And so it is with this "duck"; it must be insurance.' Comment, Waiving Local Government Immunity in North Carolina: Risk Management Programs Are Insurance, 27 Wake Forest L.Rev. 709, 715 (1992) (quoting City of Laramie v. Facer, 814 P.2d 268, 273 (Wyo. 1991))."
Strength, 622 So.2d at 1288-89 (footnotes omitted). *Page 580 
In response to this Court's decision in `Strength, the Department adopted the current Fund guidelines, which became effective on October 1, 1995. Those guidelines expressly state that they "shall not constitute a policy of insurance, and shall not constitute a binding contract of insurance between the State of Alabama and any Covered Employee or Department." Before this response by the State, § 36-1-6.1 provided flexibility to the finance director, the insurance commissioner, and the attorney general as to the type coverage that covered State employees. These officials acted within the discretion provided by § 36-1-6.1 in changing the vehicle by which protection was to be provided for covered State employees. Subsection 36-1-6.1(b) (section 2 of Act No. 83-521) specifically provides that "the Finance Director, with the advice of the Insurance Commissioner and the Attorney General, may provide for self-insurance of the entire state . . .under such terms and conditions as the Finance Directorshall determine. . . ."
This Court's finding in Strength — that an insurer/insured relationship existed between the defendant there and the Fund — was based in part on the extensive language contained in the Fund instrument defining the rights and duties of the parties in terms referable to insurance. In contrast, there is no reference at all in the current Fund guidelines to insurance, other than the express statement that the guidelines do not constitute a policy of insurance. This change from a program designated as a "insurance policy" such as that before this Court in Strength to a guaranty fund before us today is not a matter of form over substance; the appropriate officials of the executive department properly exercised the discretion given them in the enabling legislation as to the type of program to be provided State employees.
Additionally, an essential term to any insurance policy is the applicable premium. Strength, supra. This Court has stated:
 "`The premium is of the very essence of a contract of insurance, and although the times and amount of payments made are not controlling on the question whether a contract is one of insurance, in order to have a valid contract of insurance, the rate of the premium must be agreed upon, expressly or impliedly.' George Couch, Cyclopedia of Insurance Law
§ 2:5 (1984). An instrument that fails to state the amount of, and duties of the parties with regard to, the premium fails in an essential element, and, therefore, cannot constitute an enforceable contract."
Strength, 622 So.2d at 1289; see also § 27-14-11, Ala. Code 1975. Unlike the instrument at issue inStrength, the Fund guidelines here make no reference to a premium; the guidelines neither state an amount of a premium nor the duties of the parties with regard to a premium. It is the duty of the legislature to appropriate funding for departments of state government. Subsection 36-1-6.1 (d) (section 4 of Act No. 83-521) states that "[t]he charges or costs of the liability insurance or self-insurance provided under the provision of this section shall be paid from thefunds appropriated for the operation of the several state departments, agencies, boards, or commissions." Although "[t]he Finance Director may apportion the costs or charges to the several state departments, agencies, boards or commissions in order to cover the risk involved," the fact remains that any such costs or charges, rather than being in the nature of a premium, are appropriated by the legislature for each participating department or agency. Accordingly, we find that no enforceable *Page 581 
contract of insurance exists between Raley and the Fund; thus, no insurer/insured relationship exists between Raley and the Fund, and the Fund owes Raley only the duties and obligations imposed upon it by its terms and conditions.
Raley and Sharpley argue that the only exclusions on the Fund guidelines that apply are those expressly reserved in the reservation-of-rights letter of March 11, 2002, and that any right to rely on the criminal-acts exclusion to withdraw coverage has been waived. We disagree. The Fund expressly relied on the following exclusions in its reservation-of-rights letter: "(1) Any acts or omissions of any Covered Employee not arising out of the performance of a Covered Employee's official duties in the line and scope of employment"; and "(1[8]) Personal Injury, bodily injury, or property damage expected or intended from the standpoint of the Covered Employee. This exclusion does not apply to Bodily Injury arising from the use of reasonable force to protect persons or property." However, the Fund also expressly reserved the right to "contest coverage at a later date," and it further reserved "to itself all of its Guideline defenses." Raley was convicted of manslaughter on October 18, 2002. On August 22, 2003, the Court of Criminal Appeals affirmed Raley's conviction. This Court then denied Raley's petition for a writ of certiorari on December 12, 2003. The Fund notified Raley by letter on August 10, 2004, that it was "exercising its right to terminate payment for [his] defense," relying on the exclusion prohibiting coverage for an injury caused by a criminal act of a covered employee for which the covered employee was convicted following a criminal prosecution. An invocation of the criminal-acts exclusion by the Fund in March 2002 would have been premature, because the exclusion applies only if "a judgment of conviction has been entered in a criminal prosecution." The reservation by the Fund of its right to "contest coverage at a later date" and of "all of its Guideline defenses" was effective to reserve the criminal-acts exclusion until such time as Raley's conviction for a criminal act ripened by virtue of the finality of his appeals. Exclusion 12, by its express definition, was not applicable in March 2002, when the Fund notified Raley that it was extending to him a defense under a reservation of rights.
Sharpley also argues that the Fund has waived the criminal-acts exclusion because it delivered a copy of the Fund guidelines to Raley only after he had filed the declaratory-judgment action. Sharpley relies on § 27-14-19(a), Ala. Code 1975, and this Court's decision in Brown Machine Works Supply Co. v.Insurance Co. of North America, 659 So.2d 51 (Ala. 1995). Section 27-14-19(a) provides:
 "Subject to the insurer's requirements as to payment of premium, every policy shall be mailed or delivered to the insured or to the person entitled thereto within a reasonable period of time after its issuance, except where a condition required by the insurer has not been met by the insured."
In Brown Machine Works, this Court held that "where a statute requires delivery of a policy to the insured and the insurer fails to deliver the policy according to the statute, the insurer may be estopped from asserting coverage conditions or exclusions that are in the policy but are not disclosed to the insured." 659 So.2d at 57.
We note that the Fund guidelines fall within the definition of public records set forth in § 41-13-1, Ala. Code 1975, and are subject to public disclosure. Further, Sharpley's reliance on § 27-14-19(a) and Brown Machine Works is misplaced. *Page 582 
Both § 27-14-19(a) and Brown Machine Works
address the delivery of an insurance policy. As we have already determined, no enforceable contract of insurance exists between Raley and the Fund; rather, the Fund, in accordance with § 36-1-6.1, provides the benefits of defense and indemnification to covered State employees, subject to the restrictions contained in the Fund guidelines. Therefore, § 27-14-19(a) and Brown Machine Works are not applicable to estop the Fund from relying on the criminal-acts exclusion in this case. Accordingly, we conclude that the individual State defendants have not waived their right to rely on the criminal-acts exclusion under the Fund guidelines.
The criminal-acts exclusion is clear and unambiguous, and it effectively excludes Raley from indemnification by the Fund. Therefore, we affirm the trial court's judgment finding that Raley was not entitled to indemnification from the Fund should a judgment be entered against him in the federal litigation brought by Sharpley.
 II. Case No. 1050547
The individual State defendants argue that the trial court lacked jurisdiction to compel them to provide Raley with a legal defense because, they say, he was not covered under the clear terms of the Fund guidelines. The Fund, through the Department, expressly provided Raley a defense to the federal action "until the matter of coverage can be resolved," and it further reserved its rights "to withdraw from defense or to contest coverage at a later date and reserve[d] to itself all of its Guideline defenses." Additionally, we note that section 5 of the Fund guidelines vests the attorney general with the sole authority to "defend or refuse to defend" any covered employee. The guidelines provide: "Legal representation for all Covered Employees as defined herein shall be by the Attorney General of the State of Alabama or by a Special Assistant or Deputy Attorney General properly appointed by the Attorney General pursuant to § 36-15-21, Code of Alabama 1975. It shall be the sole duty and right of the Attorney General todefend or to refuse to defend and Covered Employee in anyaction hereunder."
The State defendants initially chose to defend Raley in the federal action under a reservation of rights. However, after Raley was convicted of manslaughter, he was excluded from coverage by the Fund based on the criminal-acts exclusion in the Fund guidelines. Once the coverage issue was resolved against Raley, the State defendants were no longer obligated to defend Raley based on their reservation to provide a defense "only until the matter of coverage [could] be resolved" and "to withdraw from the defense . . . at a later date." Further, we cannot say that the State defendants acted beyond the discretion afforded by section 5 in refusing to defend Raley, because he had been excluded from coverage by the Fund based on the criminal-acts exclusion. Raley cites UniversalUnderwriters Ins. Co. v. Youngblood, 549 So.2d 76
(Ala. 1989), and argues that the duty to defend is broader than the duty to indemnify. Youngblood, however, is distinguishable from this case in that Youngblood
deals with an insurer's duty to defend its insured, whereas here we have already determined that an insurer/insured relationship does not exist between Raley and the Fund. Accordingly, we conclude that the State defendants do not owe Raley a duty to defend him in the federal litigation brought by Sharpley.
The judgment as to the individual State defendants is reversed and the cause is remanded. Because we have previously held that the State of Alabama and the Fund are not proper defendants, the appeal is dismissed as to them. *Page 583 
1050460 — AFFIRMED IN PART; APPEAL DISMISSED IN PART.
1050547 — REVERSED IN PART AND REMANDED; APPEAL DISMISSED IN PART.
1050553 — AFFIRMED IN PART; APPEAL DISMISSED IN PART.
COBB, C.J., and SEE, LYONS, WOODALL, STUART, SMITH, and PARKER, JJ., concur.
MURDOCH, J., concurs in part and concurs in the result.